UNITED STATES v. FLOURNOY LIVE-STOCK & REAL-ESTATE CO.
et al.

(Circuit Court, D. Nebraska. October 8, 1895.)

1. INDIAN LANDS—ALLOTMENTS IN SEVERALTY—LEASES.
   Leases made by members of the Omaha and Winnebago tribes of Indians, of lands allotted to them in severalty, under the acts of congress of February 21, 1863, August 7, 1882, and February 8, 1887, without the authority of the secretary of the interior, are wholly void. Beck v. Real-Estate Co., 12 C. C. A. 497, 65 Fed. 30, followed.

2. EQUITY—JURISDICTION—INADEQUACY OF REMEDY AT LAW.
   Equity has jurisdiction of a bill brought by the United States, as trustee for the Indians to whom lands have been allotted in severalty, pursuant to the treaties and acts of congress providing that the United States will hold the land so allotted in trust for the benefit of the allottees, against persons who have illegally secured leases of such lands and taken possession thereof,—such bill seeking to oust such intruders, and to restrain them from inducing the Indians to make further leases, and from interfering with the Indian agent in the performance of his duties,— since the remedy by action of ejectment, even if such action could be maintained, would be inadequate.

3. EQUITY PLEADING—MULTIFARIOUSNESS.
   A bill in equity by the United States, as trustee for Indians to whom lands have been allotted in severalty, seeking to oust persons occupying such lands under void leases, and to restrain the making of other such leases, is not multifarious, though exhibited against persons holding under leases from different lessors, and having no common interest in the suit, since the United States have one common interest touching the matter of the bill, arising out of the trust relation existing between them and the Indians in regard to the lands.

This was a suit by the United States against the Flournoy Live-Stock & Real-Estate Company and others to restrain the defendants from leasing and occupying certain Indian lands. The defendants demurred to the bill.

A. J. Sawyer, U. S. Atty., and R. W. Breckenridge, for the United States.

H. C. Brome and Daley & Jay, for defendants.

SHIRAS, District Judge. In the bill filed in this case, it is averred: That the Winnebago tribe of Indians was originally domiciled on lands situated in the state of Minnesota. That by the provisions of the act of congress approved February 21, 1863, the president of the United States was authorized to take steps for the peaceful removal of the tribe from that state, and to set apart for the use of the tribe a tract of unoccupied land, not within the limits of any state, and in extent at least equal to their existing reservation in Minnesota. That in pursuance of this act the tribe was first removed into the then territory of Dakota, and from there, in the year 1865, it was removed into the then territory of Nebraska; and by a treaty made between the Omaha tribe of Indians and the United States, under date of March 6, 1865, the Omaha tribe ceded and sold to the United States a tract of land from the north side of the Omaha reservation, to be used as a reservation for the Winnebagos. See 14 Stat. 667. That by a treaty made under date of March 8, 1865, between the United States and the Winnebago tribe (see 14 Stat. 671), the latter

tribe ceded to the United States all their title, right, and interest in the reservation occupied by them at Usher's Landing, in the territory of Dakota, the cession being made in consideration of the agreement on part of the United States "to set apart for the occupation and future home of the Winnebago Indians, forever, all that certain tract or parcel of land ceded to the United States by the Omaha tribe of Indians on the 6th day of March, A. D. 1865, situated in the territory of Nebraska  *  *  *"; the United States further agreeing "to erect on said reservation an agency building, schoolhouse, warehouse, and suitable buildings for the physician, interpreter, miller, engineer, carpenter, and blacksmith, and a house 18x24 feet, one and a half stories high, well shingled and substantially finished, for each chief."

It is further averred in said bill that in the act of congress, approved February 21, 1863, it was provided that when the tribe should be removed to the new reservation the secretary of the interior might allot to said Indians lands in severalty, which they may cultivate and improve, "which lands, when allotted, shall be vested in said Indian and his heirs without the right of alienation, and shall be evidenced by patent"; it being further declared in said act "that said Indians shall be subject to the laws of the United States and to the criminal laws of the state or territory in which they may happen to reside. They shall also be subject to such rules and regulations as the secretary of the interior may prescribe; but they shall be deemed incapable of making any valid civil contract with any person other than a native member of their tribe without the consent of the president of the United States." And it is alleged that under the provisions of this act, in the year 1871, about 1,000 acres of land were allotted to individual Indians.

It is further averred: That on the 8th of February, 1887, congress passed an act entitled "An act to provide for the allotment of lands in severalty to Indians on the various reservations and to extend the protection of the laws of the United States and the territories over the Indians and for other purposes." That under the provisions of this act a large body of land embraced within, and forming a part of, the reservation in Nebraska, has been allotted to individual Indians, such allotments being approved by the secretary of the interior in September, 1893; the patents being issued in December, 1893, and each patent containing the recital that "the United States of America, in consideration of the premises, and in accordance with the provisions of the 5th section of said act of congress of the 8th of February, 1887, hereby declares that it does and will hold the land thus allotted (subject to all the restrictions and conditions contained in said 5th section), for the period of twenty-five years, in trust for the sole use and benefit of the allottee named therein."

It is further averred in said bill: That in the treaty between the Omaha Indians and the United States concluded March 6, 1865, it was provided that all laws passed, or which may be passed, by congress, regulating trade and intercourse with the Indian tribes, shall have full force and effect upon the Omaha reservation, and that no white person, except such as shall be in the employ of the United States, shall be allowed to reside or go upon any portion of said

reservation without the written permission of the superintendent of Indian affairs, or the agent of said tribe, and that no lands assigned in severalty to any Omaha Indian shall be aliened, or otherwise disposed of, except to the United States, or other members of the tribe, under such rules and regulations as shall be prescribed by the secretary of the interior. That on the 7th of August, 1882, congress passed an act providing for allotments in severalty to the members of the Omaha tribe, the sixth section of said act providing "that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs, according to the laws of the state of Nebraska, and that at the expiration of such period the United States will convey the same by patent to said Indian, or his heirs, as aforesaid in fee, discharged of said trust, and free of all charge or incumbrance whatsoever. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance and contract shall be absolutely null and void." That under the provisions of this act a large quantity of the lands in said reservation were allotted to individual Indians of the Omaha tribe, and patents issued therefor, each patent reciting the stipulation contained in the sixth section of said act.

It is further averred in said bill that there was no provision made by treaty, act of congress, or otherwise, for the leasing of any lands assigned or allotted to Indians in severalty, or held in common, other than to native members of their respective tribes, until the passage of the act of congress adopted February 28, 1891, amendatory of the act of February 8, 1887, which conferred power on the secretary of the interior to prescribe rules and regulations for the leasing of lands allotted to Indians whenever, by reason of age or other disability, the allottee was not able to occupy or improve the lands assigned to him.

It is further averred that said Omaha and Winnebago tribes of Indians have always been, and now are, under the charge and control of an Indian agent, who is under the direction of the commissioner of Indian affairs; that the present agent for said tribe is William H. Beck, captain in the tenth cavalry, United States army, who was appointed in June, 1893, by the president of the United States, pursuant to the act of congress of July 13, 1892, which authorized the detailing army officers for such duty and service.

It is then charged in said bill that in the year 1888 one John S. Lemmon, in violation of law, commenced leasing portions of the Winnebago reservation from the Indians to whom allotments had been made; that subsequently the Flournoy Live-Stock & Real-Estate Company was organized, of which corporation said Lemmon was and is president; that Lemmon assigned to the company the leases previously taken by him, and the company proceeded to take a large number of additional leases in the years 1890-91, running from five to ten years, the whole amount thus leased amounting to fully 37,000 acres; that John B. Carey and several other parties named

in the bill have, in violation of law, leased of individual members of the Omaha and Winnebago tribes several thousand acres of lands allotted in severalty under the acts of congress hereinbefore recited; and that these parties, including the Flournoy Live-Stock & Real-Estate Company, have sublet these lands to a large number of persons named in the bill, who are now in actual possession of said lands.

It is further charged that all the leases thus made were taken by the named parties in open violation of law, contrary to the rules and regulations adopted by the interior department relative to the leasing of allotted lands, and against the protests of the present agent of said tribes and his predecessors; that the parties in possession are cultivating the lands for their own benefit; that they refuse to vacate the same, and wholly refuse to recognize the rights and power of the United States over said lands, as trustee for said Indians; that the presence of the named parties upon said lands, under the circumstances detailed, is inimical to the best interests of the Indians, subversive of the just authority of the United States, and a direct interference with the control of the department of the interior, through the commissioner of Indian affairs and the agent for said tribes, over said lands and the reservation of which they form part, and also greatly interferes with the efforts of the United States government to civilize said Indians, and to prepare them for and advance them in the rights and duties of citizens of the United States.

It is further charged in said bill that in an action in equity brought by the Flournoy Live-Stock & Real-Estate Company v. William H. Beck, in the United States circuit court for the district of Nebraska, and thence appealed to the circuit court of appeals for the Eighth judicial circuit (12 C. C. A. 497), it was held and ruled that the leases obtained by the named company were wholly void; that nevertheless the said company, and parties holding under it, continue to assert title to said leased lands, and refuse to vacate the same; that the company continues to sublet the lands unlawfully held by it, and encourages the occupation of the lands in question by the parties to whom it has leased the same. In the bill is to be found a full description of the lands thus claimed to be unlawfully leased and occupied, together with a statement of the several parties in possession of said lands under said leases, thus alleged to be wholly void and illegal. The Flournoy Company and the other parties named, in number 231, are made parties defendant to the bill, and a mandatory injunction is prayed, restraining the defendants from interfering with the Indian agent in the discharge of his official duties in connection with the lands of said reservations set apart for the Omaha and Winnebago tribes of Indians; from in any manner inciting or inducing any of said Indians to lease or otherwise contract about said lands without the consent of the Indian agent, under the rules and regulations of the secretary of the interior; commanding them to immediately vacate all lands held in possession by them; and restraining them from entering upon any of said lands, or from leasing or contracting about them, in violation of law.

To the bill demurrers on behalf of the defendants have been inter-

posed, and upon the questions thus presented the case is now before the court. The grounds of demurrer, briefly stated, are that the plaintiff has a full and adequate remedy at law, and therefore there is not jurisdiction in equity; that the bill is multifarious, in that it is exhibited against a number of defendants, for several and distinct and independent matters; and, finally, that the allegations of the bill do not show that the plaintiff is entitled to the relief sought.

In support of the first ground stated, to wit, that a court of equity has not jurisdiction, because the remedy at law is adequate, it is argued that the United States could institute an action in ejectment against each one of the several named parties in possession of the leased lands, and in that way oust them from possession, in case it were decided that the leases were void. The action of ejectment is one which lies to regain possession of realty, with damages for the unlawful detention. The right of present possession of the lands in question is in the Indians, and not in the United States. The title is held by the government in trust for the Indians, and it is, to say the least, extremely doubtful whether the United States could maintain an action of ejectment based upon the assertion of a right to immediate possession. But, if such action might be maintained, a judgment therein would fall far short of affording the full measure of relief sought for in the present suit. The theory of the bill is that the United States is a trustee for the Indians, and holds the title of the lands in trust for them, and, by force of the treaties with them, is charged with the performance of certain duties towards them, and that there exists a trust relation of a high and delicate character, and that, for the proper performance of these trust duties, it is necessary that the defendants should not only be ousted from the possession of the leased lands, but that the defendants should be restrained from inducing the Indians to make further leases of any portion of the reservation, and from interfering with the Indian agent in the performance of his duties. The bill seeks the aid of the court, as a court of equity, to assist in the proper performance of trust duties and obligations, and to protect the rights of the Indians, and the relief sought to that end is not available in an action at law; and therefore it cannot be held that the equitable jurisdiction is barred because of the existence of an adequate remedy at law. Thus, in Kilbourn v. Sunderland, 130 U. S. 505, 9 Sup. Ct. 594, it is said, "The jurisdiction in equity attaches unless the legal remedy, both in respect to the final relief and the mode of obtaining it, is as efficient as the remedy which equity would confer under the same circumstances."

The second ground of demurrer is that the bill is multifarious, because it is exhibited against a large number of defendants who hold under different leases, executed by different lessors, and that there is no common interest justifying the bringing the one suit, instead of separate proceedings against each defendant.

In Walker v. Powers, 104 U. S. 245, it is said:

"By multifariousness 'is meant the improperly joining in one bill distinct and independent matters, and thereby confounding them; as, for example, the uniting in one bill of several matters, perfectly distinct and unconnected,

against one defendant, or the demand of several matters, of a distinct and independent nature, against several defendants, in the same bill.' Story, Eq. Pl. § 271."

In the case at bar the complainant's right of action is based upon the trust relation existing between the United States and the Indians in regard to the lands in question, and there is therefore a common interest and a common question, as against all the defendants; and therefore the bill will not be held to be multifarious, being within the rule stated in Story, Eq. Pl. § 285, to wit:

"Another exception to the general doctrine respecting multifariousness and misjoinder, which has already been alluded to, is when the parties (either plaintiffs or defendants) have one common interest touching the matter of the bill, although they claim under distinct titles, and have independent interests" (in which event the objection of multifariousness will not be sustained).

The last and principal ground of demurrer is that the plaintiff is not entitled to the relief prayed for upon the showing made in the bill, in support of which it is contended: (1) That the Indians to whom the lands have been allotted in severalty are no longer tribal Indians; are not, therefore, under the control of the agent, either as to person or property; that these Indians are citizens of the United States, and have ceased to be wards of the national government. And (2) that the leases executed by these Indians are valid, and the possession of the defendants, based thereon, is lawful.

In the sixth section of the act of congress of February 8, 1887 (24 Stat. 388), it is declared that every Indian born within the United States, to whom allotment of lands in severalty has been made under the provisions of that or any other act of congress, or under any treaty, shall be deemed to be a citizen of the United States, and entitled to all the rights, immunities, and privileges of citizenship, without in any manner impairing or otherwise affecting the right of such Indian to tribal or other property. The argument in support of the demurrer, in effect, goes upon the theory that citizenship of the alottee is inconsistent with any restraint upon the right of alienation of the lands allotted in severalty. The error of this assumption is clearly shown in the opinion of the court of appeals in the case of Real-Estate Co. v. Beck, already cited. The instances in which the United States has conferred an interest in lands upon citizens, but subject to a restraint upon alienation, are numerous, and it has never been held that a restriction upon the right of alienation is so inconsistent with citizenship that the two cannot coexist. The right to alienate lands is denied to minors, and yet, during their minority, they may be citizens of the United States, with all the privileges and rights conferred thereby. It is to be expected that in the effort to advance the Indian from his semi-savage condition, and to change his tribal condition into individual citizenship, many anomalous situations will arise, which must be viewed in the light of all the legislation upon the same subject, including the treaties made with the several tribes.

The fact, urged in argument, that under the laws of the state of Nebraska the Indians in question, to whom lands have been assigned

in severalty, have the right to vote and to hold office, does not necessarily show that the government of the United States no longer owes them any duty of protection in regard to the reservation lands, and no longer possesses any power of control over them as a tribe. In the act of congress of February 8, 1887, which declares that Indians holding lands allotted in severalty are to be citizens of the United States, we find the express exception that such citizenship shall exist "without in any manner impairing or otherwise affecting the right of any such Indians to tribal or other property." It will also be borne in mind that not all of the Omaha and Winnebago Indians are living upon lands allotted in severalty, nor have all the lands embraced within the boundaries of the reservation been thus allotted. By the express terms of the treaties made with these Indians, the United States assumed the duty of preserving the reservations for the use, occupancy and benefit of the Indians, and this duty is still incumbent upon it; and it is also the fact that the United States still recognizes the continued existence of the Omaha and Winnebago tribes. In the absence of direct congressional action on the subject, it is for the executive branch of the government, acting through its appropriate channels, to determine when a given tribe of Indians, or any portion thereof, has so far advanced in civilization, has so far abandoned the habits of savage, or semi-savage life, and has so far adopted the customs, laws, and mode of life obtaining among the white people, that the United States can safely, and in justice to the inhabitants of the region wherein they dwell, as well as with safety and in justice to the Indians themselves, and with due regard to the treaty obligations assured to them, terminate all further control over such Indians, and leave them to the protection only of the general laws of the country. It is not for the individual white citizen, living upon the Indian reservation or in its neighborhood, to assume to determine this question, and, having determined it to suit his own views, then to assert his right to deal with the Indian, with regard to the reservation lands, in utter disregard of the rules and regulations of the department, and in direct conflict with the provisions of the acts of congress. Upon the face of the bill it is made clear that the United States still recognizes the existence of the Omaha and Winnebago tribes, and the continuance of the treaty duties assumed to them in the matter of protecting them in the use of the reservation lands; and the court is not justified in holding, as a matter of law, that these duties have been terminated because a part of the Indians have received allotments of lands, and by reason of that fact are recognized as citizens of the United States.

It is further urged in argument that lands allotted in severalty cease to be parts of the "Indian country," as that phrase is used in the statutes of the United States. Whatever may be the relation of the allotted lands to the so-called Indian country, with respect to other provisions of the statutes, such as those regulating the sale of intoxicating liquors and the like, there can be no question that the title of these lands remains in the United States; that they form part of the lands set apart as a reservation for these Indians by the treaties made with these tribes; and that the duty, and consequently

the power, belongs to the United States to take whatever steps are necessary for the proper performance of the obligations existing upon the part of the United States with regard to these lands.   It cannot be questioned that the power of the United States government over the Indian tribes is paramount and supreme.   U. S. v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109.   If the United States, by a treaty duly made with an Indian tribe, has assumed a given duty or obligation to the Indians, the power exists to properly perform this duty within the boundaries of the states, as well as within the territories.   The power to enforce its laws, and the treaties made by it, in pursuance of the provisions of the constitution, is paramount and supreme, and rests upon every foot of soil within the national boundaries.   Ex parte Siebold, 100 U. S. 371; In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658; In re Debs, 158 U. S. 564, 15 Sup. Ct. 900.   Whether the allotted lands continue to form part of the Indian country,—upon which question I express no opinion,—is a wholly immaterial question.   By the express terms of the treaty made with the Indians on the 8th of March, 1865, the United States solemnly stipulated "to set apart for the occupation and future home of the Winnebago Indians, forever, all that certain tract," etc.   If the executive branch of the government deems it necessary, for the proper performance of this treaty stipulation with the Indians, to forbid the occupancy of these lands by white men, it has the right so to do, especially in view of the fact that, in all the legislation touching the same, congress has uniformly prohibited the alienation of the lands, and has expressly declared that all contracts between the Indians and persons not native members of the tribe shall be wholly null and void.   Even if it should be the fact that the Indians living upon the allotted lands are no longer to be deemed tribal Indians, but have in fact reached the full measure of citizenship, and if it should be held that the allotted lands no longer form part of the Indian country, it would be no less true that the United States had agreed that these lands should be set apart for the occupancy and benefit of the Indians, and that the congress of the United States, when it authorized the allotment of lands in severalty, had forbidden the alienation of the lands for the period of 25 years, with the modification that in case of the disability of an allottee, by age or otherwise, to cultivate the land allotted, the same might be leased under rules and regulations prescribed by the secretary of the interior; and it is clearly the duty of the United States to prevent the alienation of the lands during the period named, and to preserve them for the use and occupancy of the Indians, and to that end it may rightfully forbid the occupancy of the lands by persons not members of the tribes.

It is also asserted in argument that the leases taken by the Flournoy Company and other defendants from the Indians to whom allotments have been made are valid, and that these lessees, and those holding under them as subtenants, cannot be rightfully dispossessed. It is averred in the bill that the Flournoy Company had brought a bill in equity in this court against William H. Beck, to restrain him from interfering with the possession of these lands under the leases in question, and that the court of appeals for this circuit had held

the leases to be wholly void. The opinion of the court of appeals will be found in 12 C. C. A. 497, 65 Fed. 30, and it is therein held that these leases were taken in open and known violation of the law. It is claimed in argument that an appeal to the supreme court of the United States has been taken from the decision of the court of appeals, and therefore the question cannot be deemed to be finally determined, and especially as against the defendants who do not claim under the Flournoy Company. It is true that, as an adjudication, the ruling of the court of appeals may not be binding upon the defendants who do not hold under the Flournoy Company; but the opinion is an authoritative declaration of the judgment of the court of appeals upon the general question involved, to which due consideration must be given, even if it be true that an appeal may have been taken therefrom. But, if it be true that the question is still open to discussion, I can only say that in my judgment the conclusions reached in that case—to wit, that the citizenship bestowed upon the Indians to whom lands had been allotted in severalty was in no way inconsistent with the restriction imposed upon their title, and that under these restrictions the leases in question are wholly void —are fully sustained by the provisions of the acts of congress hereinbefore recited, and that the correctness thereof cannot be successfully questioned. It thus appears that the leases under which the defendants claim the right to the possession of the lands allotted in severalty are wholly void, having been taken in direct violation of the provisions of the acts of congress under which the allotments in severalty were made; that the occupancy of the lands and the cultivation thereof by the defendants is wholly inconsistent with the purpose for which the lands were originally set apart as a reservation for the Indians, and with the object of the government in providing for allotments in severalty; that such occupancy is held contrary to the rules and regulations of the department of the interior, and is held, not for the benefit, protection, and advancement of the Indians, but for the benefit of the original lessees and their subtenants; that such occupancy of said lands by the defendants results in antagonizing the authority and control of the government over the Indians, and is clearly detrimental to their best interests, and materially interferes with the rules and regulations of the department charged with the duty of carrying out the treaty stipulations under which the land forming the reservations was set apart for the benefit and occupancy of the Indians. Having assumed the duty of securing the use and occupancy of these lands to the Indians, and being charged with the duty of enforcing the provisions of the acts of congress forbidding all alienations of the lands until the expiration of the period of 25 years after the allotment thereof, the government of the United States, through the executive branch thereof, has the right to invoke the aid of the courts, by mandatory injunction and other proper process, to compel parties wrongfully in possession of the lands held in trust by the United States for the Indians to yield the possession thereof, and to restrain such parties from endeavoring to obtain or retain the possession of these lands in violation of law. It follows that the demurrer to the bill must be and is overruled upon the merits.