UNITED STATES v. BERRIGAN et al.

(Third Division. Fairbanks. June 21, 1905.)

No. 270.

1. INDIANS—TREATY WITH RUSSIA.

By the third article of the treaty with Russia ceding Alaska to the United States, the latter nation agreed that "the uncivilized tribes [in Alaska] will be subject to such laws and regulations as the United States may from time to time adopt in regard to aboriginal tribes of that country." *Held*, that the Athapascan stock, including the native bands of the Tanana, belong to the uncivilized tribes mentioned in this clause. As such they are entitled to the equal protection of the laws which the United States affords to similar aboriginal tribes within its borders.

2. PUBLIC·LANDS—TREATY.

All the vacant and unappropriated lands in Alaska at the date of the cession of 1867 by Russia became a part of the public domain and public lands of the United States.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, § 2.]

3. INDIANS—ALASKA.

The uncivilized native tribes of Alaska are wards of the government. The United States has the right, and it is its duty, to protect the property rights of its Indian wards.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Indians, § 2.]

4. PUBLIC LANDS—RESERVATIONS.

Lands actually used and occupied by the native tribes of Alaska are reserved from sale or other disposal by the laws of the United States. These laws constitute a direct and mandatory prohibition against an entry of any such lands. They forbid the disturbance of the Indian right of possession by force or contract. Any contract to that end made by any such Indian is void and of no effect.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, § 46.]

5. INDIANS—TRESPASS ON·INDIAN LANDS—INJUNCTION.

The government may exclude persons who intrude upon such Indian lands by mandatory injunction; the remedy at law is wholly inadequate.

6. SAME—CONGRESS—PUBLIC LANDS—RESERVATIONS.

Congress alone has the power to dispose of lands reserved by it for the use and occupation of Indians in Alaska, and all abandonments or sales thereof procured from the Indians are void.

This suit was brought in the name of the United States, as guardian or trustee, by the District Attorney under instructions from the Attorney General. The government brings the suit for Jarvis and Henry and their people, native Alaska Indians, to remove the defendants from a small tract of land lying at the confluence of the Tanana and Little Delta rivers, and long occupied by these natives as a home and village site. The complaint alleges "that the said Jarvis and Henry are illiterate Indians, members af the aboriginal tribes of Alaska,

and, as such, are wards of the United States of America."
The complaint then discloses that these Indians have long oc-
cupied the tract with their cabins, and have supported them-
selves in the hunter state; that on March 23, 1905, the In-
dians caused a tract embracing their village and improvements
to be marked off by stakes, and posted notices on the land,
describing the tract claimed by them; that about March 28,
1905, the defendants came and trespassed upon this tract; re-
spectively claimed portions and separate parcels thereof, cut and
removed the trees, and will, unless restrained, cause the In-
dians to be ejected therefrom, and deprived of their homes and
advantages of support, and to become charges upon the bounty
of the government.

Some of the defendants do not appear or answer, but those
who do justify their entry upon the land by alleging a pur-
chase of a small tract from the Indians for a nominal sum and
the promise to pay a larger sum in the future. The answers
and the evidence show that about the time when the Indians
staked their claim and gave notice of its extent the prospectors
had discovered indications of gold placers on the headwaters
of the Little Delta, and had induced a "stampede" from Fair-
banks to that region; that the site of this Indian village be-
came valuable as the site of a proposed "Delta City" and as a
base of supplies for the new camp, whereupon those who de-
sired to establish a new town began to encroach upon the
Indian village, and to obtain the signatures of the Indians
to contracts upon the payment of small sums of money, where-
upon they entered, laid off the Indian tract into lots, blocks,
and streets, and have erected cabins thereon. The Indians
have good-naturedly accepted all sums and signed every paper
offered, and it was not until the whites had wholly occupied
their land, cut their wood, and entered into their cabins and
excluded them that they complained. Neither the answers nor
evidence show the payment of more than a nominal considera-

tion for any lot or parcel of the tract, though in some instances there is a yet unfulfilled promise to pay more. The Indians were camped in a tent on a sand bar above their old homes when the evidence was taken, while the defendants occupied their homes and lands.

To the answers alleging a purchase for a consideration the government filed a reply denying the bona fides of the purchase, and alleging that the Indians are of the uncivilized tribes of Alaska, wholly uneducated, ignorant, and illiterate, have no knowledge of property values, and that those defendants' who purchased took advantage of their ignorance and inexperience, and procured the pretended transfer for a wholly inadequate consideration, whereby they were cheated and wronged out of their lands and homes. A portion of the evidence was taken before a referee and the whole heard by the court.

N. V. Harlan, U. S. Dist. Atty.

Jeremiah Cousby, for defendant Greahl.

Heilig & Tozier, for 16 other defendants.

WICKERSHAM, District Judge. The third article of the treaty of 1867 by which Russia ceded Alaska to the United States provided for the protection of the citizenship of the inhabitants of the ceded territory as follows:

"The inhabitants of the ceded territory, according to their choice, reserving their natural allegiance, may return to Russia within three years; but if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property, and religion. The uncivilized tribes will be subject to such laws and regulations as the United States may from time to time adopt in regard to aboriginal tribes of that country."

This treaty stipulation divided the inhabitants into three general classes: (1) Those Russian subjects who preferred to reserve their natural allegiance were to do so, and were per-

mitted "to return to Russia within three. years"; (2) those Russian subjects who preferred to remain in the ceded territory, and were guarantied that they "shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property, and religion"; and (3) the uncivilized tribes in the territory, who were promised nothing more than that they should "be subject to such laws and regulations as the United States may from time to time adopt in regard to aboriginal tribes of that country."

Where territory has been acquired by the United States from a foreign power, its courts will take judicial notice of the laws which prevailed there up to the time of such acquisition. They are not, as to such acquired territories, foreign laws, but laws of an antecedent government. United States v. Perot, 98 U. S. 428, 25 L. Ed. 251; Fremont v. United States, 17 How. (U. S.) 542, 15 L. Ed. 241. Under this rule this court in the Matter of the Naturalization of John Minook (supra, p. 200), basing its opinion upon the terms of the imperial ukase conferring the power of government in Russian Alaska upon the Russian American Company, and defining the rights and status of the people of that colony, concluded that:

"It appears, then, that the imperial law recognized the Russian colonists in Alaska, their creole children, and those settled tribes who embraced the Christian faith, as Russian subjects. Those tribes not wholly dependent—the independent tribes of pagan faith, who acknowledged no restraint from the Russians, and practiced their ancient customs—were classed as uncivilized native tribes by the Russian laws. Those laws and these social conditions continued to exist at the date of the treaty of cession in 1867. The settled tribes lived, as they and their descendants do now, at Unalaska, Belkofski, Unga, Kadiak, Kenai, Seldovia, Nuchek, Tatitlek, and other points from the outer Aleutian Islands to Yakutat Bay, as also at Ft. Alexander, at the head of Bristol Bay, at St. Michael, on Bering Sea, at the Russian Mission and Nulato, on the Yukon river. At these and other colonies or trading posts they gathered in permanent villages; they sup-

ported a Russian church, attended and assisted in its services, and practiced the moral precepts taught therein. * * * It was these people, Russian colonists, creoles, and settled tribes, members of the established church, whom Russia engaged the United States to admit as citizens, and to maintain and protect 'in the free enjoyment of their liberty, property, and religion.' * * * The 'uncivilized native tribes' excluded from the naturalization benefits of the third article of the treaty were those independent pagan tribes who acknowledged no allegiance to Russia, and lived the wild life of their savage ancestors."

. The pleadings and evidence in this case show that the natives for whom the government appears belong to that stock so widely scattered throughout the Yukon and its tributary valleys, and which the science of ethnology classes as belonging to the Athapascan stock. Nor is this stock confined even to the wide ranges of the Yukon; they inhabit the whole interior of Alaska, a region almost as large as the United States east of the Mississippi river, and also nearly the whole of British North America; they crossed the mountain ranges at the head of the Yukon, and inhabited the Fraser headwaters and the region around the upper Columbia lakes. Bands of these hardy rovers were found in Washington, Oregon, and northern California; they passed from the Columbia river basin, probably by the way of the Great Salt Lake country, into New Mexico and Arizona, and thence into Mexico. The Umpquas in Oregon, and the Navajos and dread Apaches of the Mexican border, belong to this widely distributed family, and speak the common stock language spoken by their northern brothers along the Tanana and Yukon. Throughout their wide southern migration they have everywhere preserved and are characterized by a wild and roving disposition, and of all the native tribes of North America they more nearly than any other are fitly described as "uncivilized native tribes." Roche v. Washington, 19 Ind. 53, 56, 81 Am. Dec. 376. The Tinneh tribes of Alaska were uncivilized native tribes at the date of the treaty with Russia, and the evidence in this case shows that the

band for which this suit is brought still occupies that plane of culture. As such they are entitled to the equal protection of the law which the United States affords to similar aboriginal tribes within its borders.

By the terms of the treaty of 1867 Russia ceded to the United States all her territory and dominion in Alaska, including all vacant lands, property, dependencies, and appurtenances, free and unincumbered by any reservations, privileges, franchises, grants, or possessions, by any associated companies, whether corporate or incorporate, Russian or any other, or by any parties, except merely private individual property holders. The vacant, unoccupied, and unappropriated lands in Alaska at the date of cession became a part of the public domain of the United States. Kinkead v. United States, 150 U. S. 483, 14 Sup. Ct. 172, 37 L. Ed. 1152; Bennett v. Harkrader, 158 U. S. 441, 15 Sup. Ct. 863, 39 L. Ed. 1046; Malony v. Adsit, 175 U. S. 281, 20 Sup. Ct. 115, 44 L. Ed. 163; Carroll v. Price (D. C.) 81 Fed. 137. Congress has subsequently extended over that portion of the public domain lying in Alaska the mining, homestead, town site, coal land, and other general laws for their disposition and sale to settlers.

Congress has also, by special enactment, provided for the protection of the Indian right of occupancy upon the public domain in Alaska. By the eighth section of "An act to provide a civil government for Alaska," approved May 17, 1884, c. 53, 23 Stat. 24, a land office was established in Alaska, and provision made for disposing of the public mineral lands therein. The first proviso in that section is:

"That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress."

By "An act to repeal timber culture laws, and for other purposes," approved March 3, 1891, c. 561, 26 Stat. 1095 [U.

S. Comp. St. 1901, p. 1535], Congress extended the town site laws to Alaska, and provided for the sale of lands in this territory for purposes of trade and business; but provided in section 14:

"That none of the provisions of the last two preceding sections of this act shall be so construed as to warrant the sale of any lands * * * to which the natives of Alaska have prior rights by virtue of actual occupation."

The homestead laws and the law for the location of rights of way for railroads were extended to Alaska by the act of Congress approved May 14, 1898, the seventh section of which, however, provides:

"That this act shall not apply to any lands within the limits of any * * * Indian, or other reservation unless such right of way shall be provided for by act of Congress." Chapter 299, 30 Stat. 412 [U. S. Comp. St. 1901, p. 1580]

And by the 27th section of the act of Congress approved June 6, 1900 (chapter 786), entitled "An act making further provisions for a civil government for Alaska, and for other purposes," 31 Stat. 330, it is again provided that "the Indians * * * shall not be disturbed in the possession of any lands now actually in their use or occupation."

The evidence in this case discloses that Jarvis and Henry and their people were in the actual occupation of the tract in question when first known to the witnesses, and for at least eight years prior thereto, and long prior to any entry by the defendants. This being admitted, it follows that the defendants can acquire no rights in the lands by virtue of the United States land laws, which forbid a sale thereof, or any entry thereon. The law, however, is even much broader in its scope, for the act of June 6, 1900, expressly declares that "the Indians * * * shall not be disturbed in the possession of any lands now actually in their use or occupation." This is not only a direct and mandatory congressional prohibition against

2 A.R.—29

an entry under the land laws, but it forbids as well any other act which shall disturb their possession, and renders void all attempts to dispossess them by deed or contract.

The United States has the right, and it is its duty, to protect the property rights of its Indian wards. United States v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228; U. S. v. Boyd (C. C.) 68 Fed. 577; U. S. v. Flournoy (C. C.) 69 Fed. 886; U. S. v. Flournoy (C. C.) 71 Fed. 578; U. S. v. Winans (C. C.) 73 Fed. 72; U. S. v. Boyd, 83 Fed. 547, 27 C. C. A. 592. Defendants admit the right and duty of the government to maintain suits of this character, but insist that the government has a plain, speedy, and adequate remedy at law by ejectment, and that equitable relief is thereby barred. This very question was raised in a similar case (U. S. v. Flournoy [C. C.] 69 Fed. 886), and was carefully considered and decided by Judge Shiras, who upheld the equitable power of the court on the ground that the remedy at law was wholly inadequate. Counsel also cites and relies upon the case of Lane v. Jordan, 116 Fed. 623, 54 C. C. A. 79, in which the Circuit Court of Appeals for this circuit held that the district courts of Alaska had no power under the Alaska Code by injunction to transfer the possession of real property pendente lite from one litigant to another. The cases are different, however. There the court was acting under its power as a state court only, and by its interlocutory order compelled one citizen to deliver the property to another citizen in advance of a trial and final decree; here the court is acting also under the power conferred upon it as a United States court by the third section of "An act providing a civil government for Alaska," approved May 17, 1884, c. 53, 23 Stat. 24, and also after trial and upon final judgment.

The defendants also rely upon the bona fides of their contracts with the Indians, but the evidence shows that the contracts were obtained without consideration, and under circumstances which clearly show that the Indians did not understand

or appreciate their force and effect. Nor can I bring myself to agree with the ruling in the case of Sutter v. Heckman, 1 Alaska, 188, holding that an Indian in Alaska has power to convey the rights reserved for him by section 27 of the act of June 6, 1900 (chapter 786, 31 Stat. 330), providing that "the Indians * * * shall not be disturbed in the possession of any lands now actually in their use or occupation." Such a rule would completely nullify the act of Congress, or at least permit the Indian to do it, and thus leave him a prey to the very evil from which Congress intended to shield him. Congress alone has the right to dispose of the lands thus specially reserved for his occupancy, and any attempt to procure him to abandon them is void. He is a dependent ward of the government, and his reserved lands are not subject to disposal or sale or abandonment by him. Relief prayed for by the United States is granted.