Robt. L. Williams, *et al* v. Chas. Steinmetz, *et al.*

(Filed September 7, 1905.)

1. INDIAN ALLOTMENT, LEASE OF—Void, When—Growing Crops. Tenant. A lease of an Indian allotment, which has not been approved by the secretary of the interior is absolutely null and void and where a party, under such lease, plants the land to corn and cultivates it, and the cattle of the allotee, in connection with he cattle of another, break down the fence and destroy such corn, the lessee cannot recover for the value of his share thereof, the lease having been made in violation of a positive statute, the law will grant him no relief.

2. INDIAN LANDS—Leased, How. Section 3 of the act of February 28th, 1891, ch. 383, 26 U. S. Stat. at Large, 794, does not authorize the leasing of the lands embraced within an Indian allotment, unless it is made to appear to the secretary of the interior that the allotee cannot, by reason of age or other disability, personally and with benefit to himself occupy or improve his allotment or any part thereof.

3. INDIAN ALLOTMENT—Rights of Allotee under Statute. The conferring of the rights of citizenship upon an Indian allotee does not authorize him to alienate or lease the land alloted to him, or to make any contract in relation thereto in violation of section 5 of the act of Feb. 8th, 1887. (Ch. 119, 24 St. at Large, 399.)

(Syllabus by the Court.)

*Error from the District Court of Caddo County; before Frank E. Gillette, Trial Judge.*

*Grinstead & Boys,* for plaintiff in error.

*A. J. Morris,* and *Glitsch & Glitsch,* for defendants in error.

Opinion of the court by

BURWELL, J.: A portion of section 31 of township 8, north of range 8, west of the Indian Meridian, in Caddo county, was alloted to Robert L. Williams, who was a son of W. G. Williams (a white man who had been adopted into the Caddo tribe of Indians) and of a Caddo Indian woman. During the month of April, 1901, Charles Steinmetz and W. H. Painter entered into an oral agreement with Robert L. Williams, the allottee, whereby they leased the land for one year, and were to pay therefor one-third of the corn and one-fourth of the cotton. They went into possession of the land and planted one hundred and ten acres in corn, and cultivated the same. The cultivated land was inclosed by a good fence.

W. G. Williams had leased certain lands known as pasture No. 10, the boundaries of which included this allotment, but it was expressly excepted from the land conveyed by such lease. His lease was in writing, and had been approved by the secretary of the interior, and did not expire until after the transaction involved in this suit. In this pasture were some seven or eight hundred cattle, two hundred of which belonged to W. G. Williams, and the others all belonged to Robert L. Williams. These cattle broke through the fence and destroyed the corn which had been planted by the lessees of Robert L. Williams. This action was commenced to recover for such destruction. Judgment was rendered against the defendants for $697, and they appealed to this court.

The first question to be determined is the rights of the plaintiffs under the oral lease made with the allotee; and in deciding this we should look to the federal statutes, and see

what powers have been conferred on Indians in such circumstances. By article 4 of the treaty of June 4th, 1891, relating to the acquisition of the land in question, after providing for the allotment of lands to the members of the tribe, interested, it is provided:

"When said allotments of land shall have been selected and taken as aforesaid, and approved by the secretary of the interior the titles thereto shall be held· in trust for the allotees, respectively, for a period of twenty five years, in the manner and to the extent provided for in act of congress entitled: 'An act to provide for the allotment of land in severalty to Indians on various reservations, and to extend the protection of the laws of other purposes.' Approved February 8th, ·1887. And at the expiration of twenty five years the title thereto shall be conveyed in fee simple to the allotees, or their heirs, free from all incumbrances."

It will be seen that the titles to these lands shall be held in trust for the allotees for a period of twenty five years, in the manner and to the extent provided for in the act of congress referred to in the section just quoted, which is section 5 of chapter 119 of vol. 24, U. S. Statutes at Large, page 387, which says:

"That upon the approval of the allotments provided for in this act by the secretary of the interior, he shall cause patents to issue therefor ·in the name of the allotees, which patents shall be of the legal effect, and declare that the United States does and will hold the lands thus alloted, for the period of twenty five years, in trust, for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the state or territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or

incumbrance whatsoever: *Provided,* That the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and alloted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void."

The making of the lease in question was plainly a violation of this statute. It was "a contract made touching the land" and "conveying the same" within the spirit of the law, and was therefore null and void.

In the case of *Larson v. First National Bank* (Neb.), 87 N. W. 18, it was held, where a lease had been taken from Indians for certain lands which had been alloted to them, and then a sub-lease made to a third party and a note taken for the consideration of such sub-lease, that the note was a part of the contract of sub-lease, and that the entire transaction was null and void, and that the note could not be collected even by an innocent holder.

The case of *Beck v. Flournoy Live Stock & Real Estate Co.,* 65 Fed. 30, is also in point. Justice Thayer in discussing the power of Indians to lease their alloted lands, said:

"It is manifest, we think, from an inspection of the various acts to which reference has been made above, that congress did not intend to authorize, and has not in fact authorized, the members of Indian tribes to whom allotments of land have been made in severalty under the act of February 21st, 1863, and the act of Feb. 8th, 1887, to lease or otherwise dispose of their rights to use and occupy the lands alloted to them." And in the same connection stated further:

"These limitations upon the power of the Indian to sell or make contracts respecting land that might be set apart to them for their individual use and benefit were imposed to protect them from the greed and superior intelligence of the white man. Congress well knew that if these wards of the nation were placed in possession of real-estate, and were given capacity to sell or to lease the same, or to make contracts with white men with reference thereto, they would soon be deprived of their several holdings: and that, instead of adopting the customs and habits of civilized life, and becoming self-supporting, they would speedily waste their substance, and very likely become paupers. The motive that actuated the law-maker in depriving the Indians of the power of alienation is so obvious, and the language of the statute in that behalf is so plain, as to leave no room for doubt that congress intended to put it beyond the power of white men to secure any interest whatever in lands situated within Indian reservations that might be alloted to Indians."

The question arose again in the case of *United States v. Flournoy Live Stock & Real Estate Co.,* 69 Fed. 886. Justice Shiras said:

"Leases made by members of the Omaha and Winnebago tribes of Indians, of lands alloted to them in severalty, under the acts of congress of February 21st, 1863, August 7, 1882, and Feb. 8, 1887, without the authority of the secretary of the interior, are wholly void."

It should be remembered however that the above rule is not intended to apply where the lease falls within the provisions of section 3 of the act of February 28, 1891 (26 U. S. St. at L., 795,) and made by the Indian and approved by the secretary of the interior. This section provides:

' "That, whenever it shall be made to appear to the secretary of the interior that, by reason of age or other disability, any allotee under the provision of said act, or any other act or treaty, cannot personally and with benefit to himself occupy

or improve his allotment or any part thereof, the same may be leased upon such terms, regulations and conditions as shall be prescribed by such secretary, for a term not exceeding three years for farming or grazing, or ten years for mining purposes."

These provisions are an exception to the general rule and authorize the leasing of the lands of those Indians who cannot, by reason of age or other disability, personally and with benefit to themselves, occupy or improve their allotments or any part thereof, under such terms, regulations and conditions as shall be prescribed by the secretary of the interior. Robert L. Williams does not come within this exception. He was not prevented by reason of his age or other disability from farming the land profitably. The purpose of the government in alloting lands to Indians in severalty is to encourage them in the cultivating of such lands, and to induce them, if possible, to establish fixed places of abode and acquire habits of industry. The allotee is supposed to live on the land and cultivate it himself. It may be leased only if he, by reason of age or disability, cannot properly cultivate and care for it himself. The lease in question was made in violation of a positive statute of the United States, and therefore the courts will not aid the parties in enforcing it. Nor will they grant relief when its terms have been violated. The lessees had no right on the alloted land of Robert L. Williams and they planted and cultivated the crops at their own peril. For their destruction, they cannot recover damages. *Light v. Conover,* 63 Pac. 966; *Mayes v. Cherokee Strip Live Stock Ass'n et al.* (Kans.) 63 Pac. 215.

The contention that the oral lease was approved by the department of the interior is without any merit. Under the

rules of that department then in force, a lease of Indian land had to be written, using the government blanks, and then, after it was signed up by the parties, the approval of the secretary of the interior had to be endorsed thereon. It has always been the policy of the government to require such leases to be in writing, so that the provisions of the contract could not become an issue of fact. The policy of the Indian agent to permit the allotee, Williams, to handle his own land could not be construed as an approval of the lease in question. By such policy he simply followed out the spirit of the statutes, as Williams had no mental or physical disability, and was fully able in every way to cultivate and improve his own land. The corn had not been harvested, and a suit for damages for its destruction necessarily involves the legality of the lease.

But it is also contended by the appellees that Williams, under the federal statutes (Act of Feb. 8, 1887, Ch. 119, sec. 6) was, at the time of making the oral lease, a citizen of the United States and not bound by the statutes and rules of the secretary of the interior in relation to leasing Indian lands. Section 6 referred to is as follows:

"That, upon the completion of said allotments and the patenting of the lands to said allotees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside; and no territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States

who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, and every Indian in Indian Territory is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges and immunities of such citizens whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

This petition is also untenable. Mr. Justice Gray, in the case of *Jones v. Meehan*, 175 U. S., 1, in speaking of the force of this citizenship provision, said:

"That provision might not enable individual Indians to alienate lands which were not before alienable." Citing *Beck v. Flournoy Co.* 27 U. S. App. 618; *Eells v. Ross* 29 U. S. App. 59; *Combs v. Petitioner*, 127 Mass. 278. And again in *Beck v. Flournoy Live Stock & Real Estate Co. supra.* the rule is stated in the following language:—

"It is urged, as we understand, that congress could not make these Indians citizens of the United States without at the same time giving to them the unrestricted power to sell, use, and control all property whatsoever in which they chanced to have an interest. This argument appears to us to be untenable. We know of no reason nor has any been suggested, why it was not competent for congress to declare that those Indians should be deemed citizens of the United States and entitled to the rights, privileges and immunities of citizens, while it retained, for the time being, the title to certain lands, in trust for their benefit, and with-held from them for a certain period the power to sell, lease, or otherwise dispose of their interest in such lands. It is competent for a private donor by deed or other conveyance, to create an estate of that character; that is to say, it is competent for a private person to make a conveyance of real property, and to

with-hold from the donee, for a season, the power to sell or otherwise dispose of it. And we can conceive of no sufficient reason why the United States, in the exercise of its sovereign power, should be denied the right to impose similar limitations, especially when it is dealing with a dependent race like the Indians, who have always been regarded as the wards of the government. Citizenship does not carry with it the right on the part of the citizens to dispose of land which he may own in any way that he sees fit without reference to the character of the title by which it is held. The right to sell property is not derived from, and is not dependent upon, citizenship; neither does it detract in the slightest degree from the dignity or value of citizenship that a person is not possessed of an estate, or, is possessed of an estate that he is deprived, for the time being, of the right to alienate it. It does not follow, therefore, that the power of these Indians to deal with land which was held by the government in trust for their benefit was sensibly enlarged, or that the restriction against alienation found in the fifth section of the act of Feb. 8, 1887, was removed, because, in the sixth section of the same act, congress saw fit to declare that when land had been alloted to an Indian or he had separated from his tribe, and adopted the habits of civilized life, he should be entitled to all the "rights, privileges and immunities" of a citizen. The two sections of the act are by no means inconsistent with each other. The clause imposing a limitation upon the power of alienation is not in conflict with the subsequent clause conferring the boon of citizenship. Both provisions may well stand together. They were inserted for a well-defined purpose, which it is easy to comprehend; and the act should be so construed as to give effect to both provisions, and thereby accomplish the purpose of the law-maker. For these reasons we have no hesitation in holding that the leases secured by the real-estate company were executed in open violation of the laws of the United States, and are therefore utterly null and void."

To the same effect is *United States v. Flournoy Live Stock & Real Estate Co., supra*, and *United States v. Flournoy Live Stock etc. Co.*, 71 Fed. Rep., 576.

These authorities settle the point against the appellees. The provisions of section six of the act of Feb. 8, 1887, in no way conflict with section five of the same act. The confering of citizenship by the terms  of the latter did  not authorize them to lease, convey or make any contract in relation to alloted land; and such contracts, when made, except under conditions heretofore stated, by the terms of section five, are absolutely null and void.

For the reasons herein stated, the judgment of the lower court is hereby reversed, and the cause dismissed with prejudice at the cost of appellees.

.Gillette, J., who presided in the court below, not sitting; all the other Justices concurring.