BECK v. FLOURNOY LIVE-STOCK & REAL-ESTATE CO.

(Circuit Court of Appeals, Eighth Circuit. December 10, 1894.)

No. 520.

1. INDIAN LANDS—ALLOTMENTS IN SEVERALTY—LEASES.

In 1863, the W. tribe of Indians was removed to a new reservation, pursuant to an act of congress which provided that the secretary of the interior might allot lands in severalty to the individual members of the tribe, which should be vested in such individuals, and their heirs "without the right of alienation." Some allotments were made under this act by patents containing this restriction. In 1887, another act of congress made further provision for allotment of lands to the Indians in severalty, such lands to be held in trust for the Indians and their heirs, by the United States, for 25 years, any conveyance of or contract touching such lands being declared absolutely null and void. The same act provided that Indians so receiving lands in severalty should thereby become citizens of the United States, and entitled to all the rights of such citizens. A large amount of land was allotted under this act. The F. Co., without the sanction of the commissioner of Indian affairs, obtained leases from the allottees of large quantities of these lands allotted under both acts. Upon learning this fact, the commissioner directed the Indian agent to notify such lessee that the leases were void, and would not be recognized by the government, and that the lands must be vacated by a day certain, which the agent proceeded to do. *Held,* that the citizenship bestowed on the Indians was in no way inconsistent with the restriction upon their title to their lands, and that the leases obtained by the F. Co. were utterly void.

2. EQUITY JURISDICTION—IRREPARABLE INJURY.

The F. Co. having obtained an injunction against the agent forever restraining him from disturbing it in its possession or use of the lands, *held*, further, that such injunction was erroneously issued, since the agent had done no more than to give notice, under the direction of his superiors, that the leases were void, which gave no ground for an appeal to equity, on the pretense that he was about to commit a wrongful act, which would cause irreparable injury, and such injunction was, in any event, too broad.

3. SAME—COMING INTO EQUITY WITH CLEAN HANDS.

*Held,* further, that as the F. Co. had evidently embarked upon the business of securing the leases with knowledge of their illegality, and in reliance upon the difficulties the government would meet in getting rid of them, a court of equity would not interfere, at the instance of such wrongdoer, to restrain any action the government might take to vindicate its rights, but would leave it to seek damages at law for whatever injury it might sustain.

Appeal from the Circuit Court of the United States for the District of Nebraska.

This was a suit by the Flournoy Live-Stock & Real-Estate Company against William H. Beck to restrain him from interfering with complainant's possession of certain lands. The circuit court rendered a decree in complainant's favor. Defendant appeals.

Ralph W. Breckenridge, Sp. Asst. to U. S. Atty. (A. J. Sawyer, U. S. Atty., on the brief), for appellant.

H. C. Brome (A. H. Burnett and R. A. Jones, on the brief), for appellee.

Before CALDWELL and THAYER, Circuit Judges.

THAYER, Circuit Judge. This is an appeal from a decree rendered in favor of the Flournoy Live-Stock & Real-Estate Company, who was the complainant in the circuit court, whereby the appellant, William H. Beck, was enjoined from interfering with the complainant's possession of a large body of land situated within the limits of the Omaha and Winnebago Indian reservation in the state of Nebraska. In June, 1893, the appellant, who is a captain in the United States army, was detailed by the president to take charge of the Omaha and Winnebago Indian agency in the state of Nebraska, pursuant to an act of congress approved on July 13, 1892, which authorized army officers to be detailed by the president for such service. 27 Stat. 120, c. 164. Prior to that time, during the year 1890 and the early part of the year 1891, the Flournoy Live-Stock & Real-Estate Company, which will be hereafter referred to as the "Real-Estate Company," had secured leases from certain Winnebago Indians for about 37,000 acres of land lying within said reservation, and was in possession of the land, either by its agents or its sublessees, claiming the right to hold, occupy, and use the land in question. Said leases had been obtained by the real-estate company without the sanction or approval of the commissioner of Indian affairs, and, as soon as the existence of the same became known to the department of the interior, the department pronounced the leases in question to be utterly null and void, and of no force and effect whatsoever. In the month of July, 1893, after the appellant had assumed charge of the agency, he was directed by the commissioner of Indian affairs to cause notices to be served upon the appellee and upon all other persons holding leases for land within said reservation that the leases were void, and would not be recognized by the department of the interior, and that the leased premises must be vacated by the various lessees not later than December 31, 1893. The appellant was proceeding to execute this order, and to serve such notices, when the present bill of complaint was filed by the real-estate company in the circuit court of the United States for the district of Nebraska. An interlocutory injunction was granted by the circuit court on October 10, 1893, restraining the appellant from interfering with the real-estate company's possession or use of lands lying within the reservation, and held by it under leases obtained from Winnebago Indians. This injunction was modified in some respects in May, 1894, but, as finally entered on July 16, 1894, it forever enjoined and restrained the appellant from interfering with or disturbing the real-estate company or its lessees in the possession or use of the lands described in the bill of complaint.

The fundamental question presented by the record is whether the leases that have been obtained by the real-estate company in the manner aforesaid for lands situated within the Omaha and Winnebago reservation are valid, and the consideration of that question

involves a brief reference to the various treaties and acts of congress under and by virtue of which the lands in question were acquired and are now held by the Indian lessors. The Winnebago tribe of Indians was originally domiciled on lands situated in the state of Minnesota, but by an act of congress approved on February 21, 1863, the president of the United States was authorized to take such steps as he might deem necessary to effect the peaceful removal of the tribe from that state. He was also empowered to assign and set apart for the use of said tribe a tract of unoccupied land, beyond the limits of any state, in extent at least equal to their diminished reservation in the state of Minnesota. 12 Stat. 658, c. 53. Pursuant to this act the Winnebagoes were first removed and settled upon lands in the territory of Dakota, where they appear to have been located as early as the year 1865. By a treaty that was concluded between the United States and the Winnebago tribe of Indians on March 8, 1865, and proclaimed on March 28, 1866, the tribe ceded its reservation in Dakota to the United States, and in consideration therefor the United States agreed "to set apart for the occupation and future home of the Winnebago Indians forever all that certain tract or parcel of land ceded to the United States by the Omaha tribe of Indians, on the 6th day of March A. D. 1865, situated in the territory of Nebraska and described as follows, viz.: Commencing at a point on the Missouri river four miles due south from the north boundary line of said reservation; thence west ten miles; thence south four miles; thence west to the western boundary line of the reservation; thence north to the northern boundary line; thence east to the Missouri river; and thence south along the river to the place of beginning." 14 Stat. 671. Shortly after the conclusion of the aforesaid treaty the tribe moved to the reservation last described, and has since continued to live thereon. During the period of their residence on said reservation, which has been generally termed the "Omaha and Winnebago Reservation," they have at all times been under the charge and control of Indian agents who have been appointed by the government from time to time to supervise the affairs of the tribe. The fourth section of the act of congress approved on February 21, 1863 (12 Stat. 659, c. 53), provided, in substance, that when the Winnebago tribe of Indians was removed to its new reservation, the secretary of the interior might allot lands in severalty to the individual members of said tribe "not exceeding eighty acres to each head of a family other than chiefs, to whom larger allotments may be made, which lands, when so allotted, shall be vested in said Indian and his heirs without the right of alienation and shall be evidenced by patent." Under the aforesaid provision of said act, allotments were made in the year 1871 or 1872 to various members of the tribe to the extent of about 960 acres, which are a part of the lands involved in the present suit. The patents issued for the lands so allotted referred to the act of February 21, 1863, under which the same had been issued, and in the granting clause contained the following limitation, to wit: "Without the right of alienation as stipulated in the act of congress aforesaid." No further allotments of land appear to have been made to members of the Winnebago tribe of

Indians until after the passage of an act of congress approved on February 8, 1887, which is entitled "An act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the territories over the Indians, and for other purposes." 24 Stat. 388, c. 119. The first section of this act authorized the president of the United States to cause Indian reservations on which Indians were then located under the care of the government to be surveyed, and the lands to be allotted in severalty to the Indians living thereon, in certain prescribed proportions, "whenever, in his opinion, any such reservation or part thereof was advantageous for agricultural or grazing purposes." The second section of the act prescribed the manner in which land should be selected for allotment, either by the Indians themselves or by the Indian agent in charge of the reservation. The third section of the act provided that allotments should be made under the supervision of special agents appointed for that purpose, and that the allotments, when made, should be certified to the secretary of the interior for his action, and be deposited in the general land office. The fifth and sixth sections of the act, which have a more immediate bearing on the questions at issue in this case, are as follows:

"Sec. 5. That upon the approval of the allotments provided for in this act, by the secretary of the interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs, according to the laws of the state or territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: provided, that the president of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void. * * *

"Sec. 6. That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside; and no territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges and immunities of such citizens, whether said Indian has been or not, by birth or otherwise a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

Under the act last aforesaid a large body of land has now been allotted in severalty to the Winnebago Indians out of the territory embraced within the limits of their reservation in the state of Ne-

braska. Proceedings to secure such allotments appear to have been inaugurated in the year 1889, when the government detailed a special agent to supervise the proceedings; but the allotments made were not approved by the secretary of the interior until some time in the month of August or September, 1893. In the meantime, during the year 1890 and the early part of 1891, the appellee company had succeeded in obtaining leases from the various allottees for 34,-160 acres of allotted land lying within the reservation, and leases for about 1,880 acres of unallotted land within the reservation, which latter leases appear to have been executed by a committee representing, or assuming to represent, the Winnebago tribe.

It is manifest, we think, from an inspection of the various acts to which reference has been made above, that congress did not intend to authorize, and has not in fact authorized, the members of the Winnebago tribe of Indians to whom allotments of land have been made in severalty under the act of February 21, 1863, and the act of February 8, 1887, to lease or otherwise dispose of their right to use and occupy the lands so allotted to them. The act of February 21, 1863, declared that the lands allotted under that act should be vested "in the Indian and his heirs without the right of alienation." The fifth section of the same act further provided that the members of said tribe should be deemed "incapable of making any valid contract with any person other than a native member of their tribe without the consent of the president of the United States." The subsequent act of February 8, 1887, is equally, if not more, specific. It declares that, "if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned (to-wit: the term of twenty-five years), such conveyance or contract shall be absolutely null and void." These limitations upon the power of the Indians to sell or make contracts respecting land that might be set apart to them for their individual use and benefit were imposed to protect them from the greed and superior intelligence of the white man. Congress well knew that if these wards of the nation were placed in possession of real estate, and were given capacity to sell or lease the same, or to make contracts with white men with reference thereto, they would soon be deprived of their several holdings; and that, instead of adopting the customs and habits of civilized life and becoming self-supporting, they would speedily waste their substance, and very likely become paupers. The motive that actuated the lawmaker in depriving the Indians of the power of alienation is so obvious, and the language of the statute in that behalf is so plain, as to leave no room for doubt that congress intended to put it beyond the power of white men to secure any interest whatsoever in lands situated within Indian reservations that might be allotted to Indians. This conclusion is fortified by an amendment to the act of February 8, 1887, which was adopted on February 28, 1891 (26 Stat. 794, c. 383), whereby power was conferred upon the secretary of the interior to prescribe regulations and conditions for the leasing of lands allotted to Indians under the previous act of February 8, 1887, whenever, by reason of "age or other disability,"

the allottee was not able to occupy or improve the land assigned to him with benefit to himself.     It is manifest that the amendment in question, authorizing allotted land to be leased in certain cases, under the direction of the secretary of the interior, was unnecessary if power to execute leases of allotted lands had already been conferred by previous enactments or treaty stipulations.   The last-mentioned act, therefore, is a legislative declaration that congress did not intend by any previous statute to authorize the leasing of any lands that might be assigned to Indians to be held by them in severalty.

The only argument that has been advanced to sustain the validity of the leases in question is founded on section 6 of the act of February 8, 1887, heretofore quoted.   It is suggested, as we understand, that because congress conferred the right of citizenship upon all Indians to whom allotments of land might be made, and upon every Indian who should take up a residence separate and apart from his tribe, and adopt the habits of civilized life, the power to sell, lease, and otherwise dispose of allotted lands was also conferred as a necessary incident of citizenship.   It is urged, as we understand, that congress could not make these Indians citizens of the United States without at the same time giving to them the unrestricted power to sell, use, and control all property whatsoever in which they chanced to have an interest.   This argument appears to us to be untenable. We know of no reason, nor has any been suggested, why it was not competent for congress to declare that these Indians should be deemed citizens of the United States, and entitled to the rights, privileges, and immunities of citizens, while it retained, for the time being, the title to certain lands, in trust for their benefit, and withheld from them for a certain period the power to sell, lease, or otherwise dispose of their interest in such lands.   It is competent for a private donor, by deed or other conveyance, to create an estate of that character; that is to say, it is competent for a private person to make a conveyance of real property, and to withhold from the donee, for a season, the power to sell or otherwise dispose of it.   And we can conceive of no sufficient reason why the United States, in the exercise of its sovereign power, should be denied the right to impose similar limitations, especially when it is dealing with a dependent race like the Indians, who have always been regarded as the wards of the government.   Citizenship does not carry with it the right on the part of the citizen to dispose of land which he may own in any way that he sees fit without reference to the character of the title by which it is held.   The right to sell property is not derived from, and is not dependent upon, citizenship; neither does it detract in the slightest degree from the dignity or value of citizenship that a person is not possessed of an estate, or, if possessed of an estate, that he is deprived, for the time being, of the right to alienate it.   It does not follow, therefore, that the power of these Indians to deal with land which was held by the government in trust for their benefit was sensibly enlarged, or that the restriction against alienation found in the fifth section of the act of February 8, 1887, was removed, because, in the sixth section of the same act, congress saw fit to declare that when land had been allotted to

an Indian, or he had separated from his tribe, and adopted the habits of civilized life, he should be entitled to all the "rights, privileges, and immunities" of a citizen. The two sections of the act are by no means inconsistent with each other. The clause imposing a limitation upon the power of alienation is not in conflict with the subsequent clause conferring the boon of citizenship. Both provisions may well stand together. They were inserted for a well-defined purpose, which it is easy to comprehend; and the act should be so construed as to give effect to both provisions, and thereby accomplish the purpose of the lawmaker. For these reasons we have no hesitation in holding that the leases secured by the real-estate company were executed in open violation of the laws of the United States, and are therefore utterly null and void.

It is contended, however, that, even if the leases held by the appellee are absolutely null and void, yet that it was entitled to such an injunction as was granted by the circuit court, because the appellant had wrongfully and unlawfully interfered with its possession of the lands in controversy, or had threatened to do so, before the bill was filed. It is said that the circuit court very properly issued an injunction to prevent the doing of a wrongful act which would occasion an irreparable injury, notwithstanding the fact that the appellee was unlawfully in possession of the demised premises. It is a sufficient answer to this contention to say that at the time the bill was filed and at the time the injunction was obtained, in October, 1893, the appellant had done nothing to disturb the possession of the appellee other than to notify it that the leases then held by it were unlawful and void; that the demised premises must be restored to the several lessees by December 31, 1893; that no planting or sowing should be undertaken on the demised premises after that period; and that no further leases of land within the reservation should be solicited unless applied for under the provisions of the act of February 28, 1891, pursuant to regulations in that behalf prescribed by the secretary of the interior. It is not denied that notices of this nature had been served by the appellant, but in taking such action he had simply obeyed instructions received from the executive department of the government, which is charged with the duty of enforcing the laws and preventing violations thereof. It cannot be said, therefore, that in taking such action as is last described the appellant acted unlawfully; nor is there the slightest pretense for asserting that, because he was instrumental in serving the aforesaid notices upon the appellee and its lessees, a court of equity, for that reason, acquired jurisdiction to issue an injunction. We think that the record clearly shows that when the bill was filed the appellant had simply discharged his sworn duty under the law, in accordance with the directions of the department of the interior, and that there was no ground for an appeal to a court of equity on the pretense that he had committed, or was about to commit, a wrongful act which would occasion an irreparable injury.

The decree was manifestly erroneous for another reason. As it was finally drawn and entered, it provided "that the defendant, W. H. Beck, his agents and servants, be and are forever enjoined and

restrained from interfering with or disturbing the complainant or its lessees in the possession or use of the lands described in the complaint." It is apparent, we think, that a decree in this form, without any limitation or qualification, effectually precluded the defendant, as an Indian agent, from taking any action in behalf of the government, whether by means of judicial process or otherwise, that might possibly lead to an ouster of the real-estate company, and to a recovery of the possession of the land which it had unlawfully leased.    It is manifest, therefore, that in any aspect of the case the injunction was too broad, and that it ought not to be upheld.

But, aside from the foregoing considerations, there is another reason that should have influenced the circuit court to dismiss the bill of complaint, even if it had appeared in proof that, prior to the commencement of the suit, the commissioner of Indian affairs had caused notices to be served on the appellee and its sublessees that force would be used to eject them from the demised premises if they did not abandon the same on December 31, 1893.    The real-estate company obtained the leases in question notwithstanding the provisions of an act of congress which declared, in express terms, that if such leases were granted by the Indians they should be deemed utterly void.    The company appears to have been organized for the express purpose of obtaining leases of lands situated within the reservation that had been or might be allotted to members of the Winnebago tribe of Indians.    It appears to have embarked in the enterprise of securing the leases with full knowledge that it was an unlawful undertaking, and that the government would dispute the validity of whatever leases it might succeed in obtaining from the Indians.    In other words, the company deliberately took the chances of violating the law, in the belief, no doubt, that the government of the United States would be powerless to recover possession of the demised premises, if possession was actually acquired, except by bringing a multitude of suits in ejectment.    That is the position now assumed by the appellee.    It asserts with great confidence that the government must be treated as a private landowner; that it can only recover the possession of the leased lands by bringing suits in ejectment.    It is fair to infer, therefore, that the real-estate company intended at the outset to assume that position, and to rely upon that defense.    It is also fair to infer that it was led to embark in the enterprise of leasing the lands in the belief that a suit in ejectment would prove a barren remedy, and that the law might be violated with impunity.    Under these circumstances, it is clear, we think, that a court of equity should not interfere, at the instance of the appellee, to arrest any action that the government of the United States may take to vindicate its rights.    It should leave the appellee in the condition in which it has deliberately placed itself, and require it to seek redress in a court of law for whatever damage it may sustain in consequence of any wrongful act committed by government officers in ejecting it from the demised premises, if any such wrongful act is in fact committed.    We will certainly not presume that the executive department of the government intends to adopt any unlawful means to regain possession of the demised premises.    But,

be this as it may, it is not within the legitimate province of a court of equity to assist a wrongdoer, like the appellee, in retaining the possession of property which it has acquired in open violation of an act of congress, when the party against whom relief is sought is an officer of the United States, who is acting under the direction and control of the secretary of the interior. For these reasons, the decree of the circuit court will be reversed, and the case will be remanded to that court, with directions to vacate the decree, and to dismiss the complainant's bill, at the complainant's costs.