## MOSIER v. UNITED STATES.†

### (Circuit Court of Appeals, Eighth Circuit. April 22, 1912.)

### No. 3,627.

1. INDIANS (§ 34*)—SALE OF LIQUOR TO INDIANS—STATUS OF OSAGE ALLOTTEES—"GUARDIANSHIP."

Under Act June 28, 1906, c. 3572, 34 Stat. 539, relating to the Osage Indians, an allottee of that tribe who has not received a certificate of competency as therein provided is in charge of a superintendent, and an Indian over whom the Interior Department exercises guardianship within the meaning of Act Jan. 30, 1897, c. 109, 29 Stat. 506, which makes it a criminal offense to sell or give liquor to such an Indian.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 60; Dec. Dig. § 34.*

For other definitions, see Words and Phrases, vol. 4, p. 3187.]

2. INDIANS (§ 6*)—GUARDIANSHIP OF UNITED STATES—EFFECT OF CITIZENSHIP.

The relationship of guardian and ward existing between the United States and an Indian of the Osage Tribe in Oklahoma is not affected by the mere fact that such Indian may be a citizen of the United States and of the state.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 12; Dec. Dig. § 6.*]

3. INDIANS (§ 34*)—SALE OF LIQUOR—STATUTE IN FORCE IN OKLAHOMA.

That the Oklahoma Enabling Act (Act June 16, 1906, c. 3335, 34 Stat. 269) § 3, required the Constitution of the state to prohibit the sale or furnishing of liquor in certain parts constituting Indian territory or reservations, and the Constitution and legislation of the state conform to such requirement, did not effect an abandonment by the United States of the right to exercise guardianship over the Indians in the state nor prevent Act Jan. 30, 1897, c. 109, 29 Stat. 506, making it a criminal offense to sell or furnish liquor to Indians, from being in force therein.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 60; Dec. Dig. § 34.*]

In Error to the District Court of the United States for the Western District of Oklahoma.

Criminal prosecution by the United States against Eugene Mosier. Judgment of conviction, and defendant brings error. Affirmed.

Milton Brown, for plaintiff in error.

John Embry, U. S. Atty., and Isaac D. Taylor, Asst. U. S. Atty.

Before SANBORN, ADAMS, and CARLAND, Circuit Judges.

CARLAND, Circuit Judge. Mosier was tried, convicted, and sentenced upon the first count of an indictment which was in the following language:

"That heretofore, to wit, on the 28th day of December, in the year of our Lord one thousand nine hundred and nine, Eugene Mosier, whose more full name is to the grand jurors unknown, then and there being in said district, did then and there, within said district, to wit, in the county of Osage, in said Western district of Oklahoma, and within the jurisdiction of said court, unlawfully, willfully, and feloniously sell, give away, dispose of, exchange, and barter certain intoxicating liquors, to wit, whisky, to a certain Indian, to wit, to Hazel Gray, said Indian being then and there a ward of the gov-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied October 18, 1912.

ernment under charge of an Indian superintendent, and an Indian over whom the government, through the Interior Department, then and there exercised guardianship, and an Indian who had not received a certificate of competency and whose restrictions had not been removed, and who was then and there a member of the Osage tribe of Indians, in Oklahoma, and then and there and continuously theretofore a resident and inhabitant of said district and of the former territory of Oklahoma."

After conviction Mosier moved in arrest of judgment on the ground that the first count did not state an offense against the laws of the United States. The motion being overruled and exception taken, the judgment entered on the verdict has been removed here by writ of error. While other errors are assigned, the ruling on the motion in arrest is the only one reviewable by us. Section 1, Act Jan. 30, 1897 (29 Stat. 506), the law under which the indictment was framed, reads as follows:

"That any person who shall sell, give away, dispose of, exchange, or barter any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or other intoxicating liquor of any kind whatsoever or any essence, extract, bitters, preparation, compound, composition, or any article whatsoever, under any name, label, or brand, which produces intoxication, to any Indian to whom allotment of land has been made while the title to the same shall be held in trust by the government or to any Indian a ward of the government under charge of any Indian superintendent or agent, or any Indian, including mixed bloods, over whom the government, through its departments, exercises guardianship, * * * shall be punished by imprisonment for not less than sixty days, and by a fine of not less than one hundred dollars for the first offense and not less than two hundred dollars for each offense thereafter. * * *"

[1] A comparison of the indictment with the statute easily demonstrates that an offense is stated therein unless there are other statutes which have repealed the law upon which the indictment is based as to Oklahoma, or have removed Hazel Gray from the class of persons to whom it is unlawful by the terms thereof to sell, give away, or dispose of spirituous or vinous liquors. It is alleged in the indictment that Hazel Gray on December 28, 1909, was a member of the Osage Tribe of Indians, in Oklahoma, who had not received a certificate of competency and whose restrictions had not been removed. To understand the force of this allegation, we must examine Act June 28, 1906, 34 Stat. 539. This act divided all lands belonging to the Osage Tribe of Indians in Oklahoma by giving to the members of such tribe his or her fair share thereof in acres, as provided in the act. Generally speaking, each member of the tribe was entitled to make three selections of land, of 160 acres each, and to designate which one of these should be his or her homestead. The act further provided that the homestead should be inalienable and nontaxable until otherwise provided by Congress, and that the other two selections, together with the remaining lands allotted to any member, should be known as surplus land and should be inalienable for 25 years. Subdivision 7 of section 2 and section 9 of the act, so far as material, read as follows:

"That the Secretary of the Interior, in his discretion, at the request and upon the petition of any adult member of the tribe, may issue to such member a certificate of competency, authorizing him to sell and convey any of the lands deeded him by reason of this act, except his homestead, which shall

remain inalienable and nontaxable for a period of twenty-five years, or during the life of the homestead allottee, if upon investigation, consideration, and examination of the request he shall find any such member fully competent and capable of transacting his or her own business and caring for his or her own individual affairs: Provided, that upon the issuance of such certificate of competency the lands of such member (except his or her homestead) shall become subject to taxation, and such member, except as herein provided, shall have the right to manage, control, and dispose of his or her lands the same as any citizen of the United States."

"Sec. 9. That there shall be a biennial election of officers for the Osage Tribe as follows: A principal chief, an assistant principal chief, and eight members of the Osage tribal council, to succeed the officers elected in the year nineteen hundred and six, said officers to be elected at a general election to be held in the town of Pawhuska, Oklahoma Territory, on the first Monday in June; and the first election for said officers shall be held on the first Monday in June, nineteen hundred and eight, in the manner to be prescribed by the Commissioner of Indian Affairs, and said officers shall be elected for a period of two years, commencing on the first day of July following said election, and in case of a vacancy in the office of principal chief, by death, resignation, or otherwise, the assistant principal chief shall succeed to said office, and all vacancies in the Osage tribal council shall be filled in a manner to be prescribed by the Osage tribal council, and the Secretary of the Interior is hereby authorized to remove from the council any member or members thereof for good cause, to be by him determined."

An examination of the act now under consideration shows beyond question that there is an Osage Indian agency in Oklahoma, in charge of an Indian superintendent, and that as to all Osage Indians who have not received a certificate of competency the Department of Interior exercises guardianship over them. Therefore Act June 28, 1906, 34 Stat. 539, is not only not inconsistent with the allegations of the indictment, but in connection with such allegations establishes the fact on motion in arrest that Hazel Gray was on December 28, 1909, an Indian under the charge of an Indian superintendent, and also an Indian over whom the government, through the Interior Department, exercised guardianship.

It is further contended, however, that, as the indictment alleges that Hazel Gray was on the date last mentioned a member of the Osage Tribe of Indians in Oklahoma, we must take judicial notice from this allegation that she was then and there a citizen of the United States and of Oklahoma, and therefore not subject to Act Jan. 30, 1897 (29 Stat. 506), upon which the indictment is founded. In support of this position, the case of In re H'eff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848, and certain provisions of the act of June 16, 1906 (chapter 3335, 34 Stat. 267), are cited. Just how Hazel Gray became a citizen of the United States and of Oklahoma is not specifically pointed out. Act June 28, 1906, 34 Stat. 539, under which the lands of the Osage Indians were allotted, unlike General Allotment Act Feb. 8, 1887, c. 119, 24 Stat. 388, did not provide that the Osage Indians, after the allotment, should be citizens of the United States and be subject to and entitled to all the benefits of all the laws, civil and criminal, of the state wherein they resided. The act under which Oklahoma was admitted to the Union did not in express terms make the Osage Indians citizens of the United States and of Oklahoma, but, as it seems to be conceded that Hazel Gray was on December 28,

1909, a citizen of the United States and of Oklahoma, we presume that her citizenship arose by reason of her being an inhabitant of the territory which was admitted to the Union as the state of Oklahoma on an equal footing with the other states of the Union.

[2] The question, then, to be decided on this branch of the case is: Does the mere fact of citizenship destroy the allegation of the indictment that Hazel Gray was on December 28, 1909, an Osage Indian under the charge of an Indian superintendent, and an Indian over whom the government, through the Interior Department, exercised guardianship? There is certainly nothing inconsistent in being an Indian and a citizen of the United States at the same time. The word "Indian" describes a person of Indian blood. The word "citizen" describes a political status. If as a matter of law and fact the government is exercising guardianship over an Indian who is also a citizen, it is not for the courts to say when the guardianship shall cease. As was said by the Supreme Court in United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532:

"These are considerations to be addressed to Congress. It is for the legislative branch of the government to say when these Indians shall cease to be dependent and assume the responsibilities attaching to citizenship. That is a political question which the courts may not determine. We can only deal with the case as it exists under the legislation of Congress."

In the Matter of Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848, the same court, speaking upon the same subject, said:

"It (the government) is under no constitutional obligation to perpetually continue the relationship of guardian and ward. It may at any time abandon its guardianship and leave the ward to assume and be subject to all the privileges and burdens of one sui juris. And it is for Congress to determine when and how the relationship of guardianship shall be abandoned. It is not within the power of the courts to overrule the judgment of Congress."

To the same effect are the cases of Cherokee Nation v. Hitchcock, 187 U. S. 294, 23 Sup. Ct. 115, 47 L. Ed. 183; Lone Wolf v. Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299; Stephens v. Cherokee Nation, 174 U. S. 484, 19 Sup. Ct. 722, 43 L. Ed. 1041; U. S. v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228; Worcester v. Georgia, 6 Pet. 515, 8 L. Ed. 483; Wallace v. Adams, 204 U. S. 420, 27 Sup. Ct. 363, 51 L. Ed. 547. It is true that in the Heff Case the Supreme Court did decide that by the terms of the General Allotment Act of February 8, 1887, 24 Stat. 388, Congress had determined to abandon relationship of guardian toward the Indian, Heff. The decision, however, was based on the express language of said act, and in view of some recent decisions of the Supreme Court the reasoning of the court in the Heff Case may not be extended beyond the particular facts in that case.

The relationship of guardian and ward existing between the government and the Indian, Hazel Gray, is not affected by her citizenship, but, on the contrary, it is entirely consistent with it. Smith v. Stephens, 10 Wall. 321, 19 L. Ed. 933; Wiggan v. Conolly, 163 U. S. 60, 16 Sup. Ct. 914, 41 L. Ed. 69; In re Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848; Goodrum v. Buffalo, 162 Fed. 817, 89 C. C.

A. 525; U. S. v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532; U. S. v. Hall (D. C.) 171 Fed. 218; Rainbow v. Young, 161 Fed. 836, 88 C. C. A. 653; National Bank of Commerce v. Anderson, 147 Fed. 87, 77 C. C. A. 259; U. S. v. Thurston County, 143 Fed. 287, 74 C. C. A. 425; Lone Wolf v. Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299; McKay v. Kalyton, 204 U. S. 458, 27 Sup. Ct. 346, 51 L. Ed. 566; Conley v. Ballinger, 216 U. S. 84, 30 Sup. Ct. 224, 54 L. Ed. 393; Beck v. Flournoy Live Stock Company, 65 Fed. 30, 12 C. C. A. 497; U. S. v. Celestine, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. 195; Eells v. Ross, 64 Fed. 417, 12 C. C. A. 205; U. S. v. Sutton, 215 U. S. 291, 30 Sup. Ct. 116, 54 L. Ed. 200; Tiger v. Western Investment Company, 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738; United States Express Company v. Friedman et al. (C. C. A.) 191 Fed. 673; Couture, Jr., v. U. S., 207 U. S. 581, 28 Sup. Ct. 259, 52 L. Ed. 350.

In Hallowell v. United States, 221 U. S. 317, 31 Sup. Ct. 587, 55 L. Ed. 750, being the last expression of the Supreme Court bearing upon the question now under consideration, it was stated:

"It is a result of the recently decided cases in this court—Couture, Jr., v. U. S., 207 U. S. 581 [28 Sup. Ct. 259, 52 L. Ed. 350]; U. S. v. Celestine, 215 U. S. 278 [30 Sup. Ct. 93, 54 L. Ed. 195]; U. S. v. Sutton, 215 U. S. 291 [30 Sup. Ct. 116, 54 L. Ed. 200]; and Tiger v. Western Investment Company, 221 U. S. 286 [31 Sup. Ct. 578, 55 L. Ed. 738]—that the mere fact that citizenship has been conferred upon Indians does not necessarily end the right or duty of the United States to pass laws in their interest as dependent people."

In view of the decisions above cited, we are clearly of the opinion that, conceding Hazel Gray to have been a citizen of the United States and of the state of Oklahoma on December 28, 1909, that fact alone would not sever the relationship of guardian and ward existing between her and the government, or change the fact that she was then and there an Indian under the charge of an Indian superintendent.

[3] It is claimed, however, by counsel for Mosier that Act Jan. 30, 1897, 29 Stat. 506, being the law upon which the indictment is based, is not in force in the state of Oklahoma. This contention is sought to be maintained for the reason that Congress, by Act June 16, 1906, § 3, subd. 2, 34 Stat. 269, required the people of the proposed state of Oklahoma, as a condition precedent to the admission of said state into the Union, to provide in their Constitution that the manufacture, sale, barter, giving away, or otherwise furnishing of intoxicating liquors within those parts of said state known as Indian Territory and the Osage Indian reservation, and within any other parts of said state which existed as Indian reservations on the 1st day of January, 1906, should be prohibited for a period of 21 years from the date of the admission of said state into the Union, and thereafter until the people of said state should otherwise provide by amendment to the state Constitution and proper state legislation. That the people of the proposed state of Oklahoma did in their Constitution provide for the prohibition of the manufacture, sale, barter, or giving away or otherwise furnishing of intoxicating liquors within the state as required by the act of Congress above mentioned enabling the people of

the said proposed state to form a constitution and be admitted into the Union on an equal footing with the other states of the Union. That the state of Oklahoma has enacted suitable legislation which is now in force punishing the sale, barter, exchange, or giving away of spirituous liquors within her territorial limits to Indians.

Briefly stated, the claim of counsel for Mosier is this: Congress having required the people of the proposed state of Oklahoma to provide in their Constitution as a condition to their admission into the Union that the sale, barter, exchange, or giving away of intoxicating liquors should be prohibited in all those portions of said state constituting the Indian Territory, the Osage Indian reservation or other Indian reservations which existed on a certain date, and the Constitution of Oklahoma having contained such provision and the Legislature of Oklahoma having passed laws punishing the sale, barter, exchange, or giving away of intoxicating liquors, it results from this legislation that the power to deal with the subject of the sale, barter, exchange, or giving away of intoxicating liquors within the state of Oklahoma to Indians under the circumstances described in the act under which the indictment in this case is drawn, has been fully delegated to the state of Oklahoma, and that the laws of the United States in regard thereto have no application. The enabling act for the admission of Oklahoma, in addition to the provisions in regard to the sale, barter, exchange, or giving away of intoxicating liquors to Indians, also contained the following provision (section 1):

"Nothing contained in the said Constitution shall be construed to limit or impair the rights of person or property pertaining to the Indians of said territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this act had never been passed."

While Congress might at any time abandon its relationship of guardian towards Hazel Gray, it could not delegate the power granted by the Constitution of the United States to exercise guardianship towards her to the state of Oklahoma, and we do not think that Congress intended to delegate or abandon its power to regulate the sale, barter, exchange, or giving away of intoxicating liquors to Indians within the state of Oklahoma to that state by the provision in regard to the sale, barter, exchange, or giving away of such liquors contained in the enabling act. We think the true interpretation of the provision in the enabling act is that Congress thereby sought to carry out its treaty obligations and to do all in its power to suppress the traffic in intoxicating liquors among the Indians within said state, and that it is no defense to a prosecution by the United States under the act of January 30, 1897, to say that the state of Oklahoma could also punish this same offense under its law.

It was held by this court in the recent case of United States Express Co. v. Friedman et al., 191 Fed. 673, that the provision of Oklahoma Enabling Act June 16, 1906, § 3, 34 Stat. 269, did not operate to repeal by implication Act January 30, 1897, 29 Stat. 506. The con-

clusion, therefore, of the whole matter is that Congress has not clearly indicated that it has abandoned the power which it possesses to regulate the sale of intoxicating liquors among Indians within the state of Oklahoma, and that, therefore, the motion in arrest was correctly overruled, and the judgment below must be affirmed.