## SAM HUFF v. STATE.

No. A-1750.   Opinion Filed July 5, 1913.

(133 Pac. 265.)

1. **COURTS—Rules of Decision—State and Federal Courts.** The Supreme Court of the United States having decided that the acts of Congress are valid which suspend for 21 years after the admission of Oklahoma into the Union the interstate federal laws which otherwise would have permitted persons residing in that portion of the state which formerly comprised Indian Territory to introduce into the state as interstate commerce intoxicating liquors for their own use, and this being a federal question, such decisions of the Supreme Court of the United States are binding upon all of the officers and people of the state of Oklahoma, and it is the plain duty of this court to follow these decisions.

2. **INTOXICATING LIQUORS—Unlawful Conveyance—What Constitutes.** A person residing in any portion of the state of Oklahoma who may introduce into the state intoxicating liquors and distribute the same among persons who may have furnished him money to purchase said liquors thereby violates the law and is liable to prosecution and conviction for illegally conveying such liquors from one point in the state to another point in the state.

(Syllabus by the Court.)

*Appeal from County Court, Love County;*
*R. A. Keller, Judge.*

Sam Huff was convicted of violating the prohibitory law, and appeals. Affirmed.

E. M. Eskew testified for the state that he was at the depot when defendant Huff got off the train about 11:30 p. m. about 60 feet south of the depot. He had a package under his arm and started on up, passed the depot, with Green White and Sam Huff, when they were stopped and the whisky was taken from them. Said they had the whisky for club. A good many people were present. This occurred at the depot. In the conversation that took place, defendant said that he and Green White went after the whisky, and that Marshall Herd

was the secretary of the club. This transaction took place in Love county, Okla. On cross-examination witness said that Green White was making the talk about the club. He gave the name of the club members and said each had a quart of the whisky.

C. F. Cochran testified for the state that he was present at the depot when the defendant and Green White arrived with the whisky. Judge Keller was also present. They were being detained by Judge Keller. When witness walked up, they had a package under each arm and were talking when he came up. They said they had whisky. Witness took defendant and Green White to Steel's restaurant and took from them each four quarts of whisky. Green White did all the talking in the presence and hearing of the defendant and said that he got the whisky at Gainesville, Tex., at the express office and signed up for it.

Marshall Herd testified for appellant that he remembers when Sam Huff and Green White were caught with whisky in their possession on March 2, 1912. Eight of the boys made up a pot to get the whisky and defendant and Green White went after it. Whisky came in Green White's name. Witness had a quart of it. He and Tom Waters ordered it. "I got Bass, depot agent, to write the order; ordered it from Marshall Wright, Ft. Worth, Tex., directed it to be sent to Gainesville, Tex., to Green White."

Sam Gill testified for appellant that he was a restaurant keeper near the depot at Marietta, testified that he was interested in the whisky brought there on March 2d by the defendant and Green White. He owned one quart. On cross-examination witness testified that he was to go to Sam Huff's home to get his whisky.

Tom Waters testified for appellant that he had an interest of one quart in the whisky. Witness was to go and get his whisky from either Huff's or Green's.

Chas. Springfield testified for appellant that he owned one quart of the whisky taken from defendant and Green White.

Dick McCullough testified for appellant that he owned one quart of the whisky seized and paid his proportion for it.

Marsall Herd, recalled by the state, testified that the amount raised for the whisky was $6.

Horace McCullough testified that he paid for and owned one quart of the whisky. Green White was to bring it to him.

Appellant testified in his own behalf that he was assisting Green White to bring the whisky from Gainesville, Tex., to Marietta; that he owned one quart, which he had in his possession at the time of his arrest; that the rest of the whisky was to be distributed among the owners. Marshall Herd ordered the whisky.

*Eddleman & Graham,* for appellant.
*E. G. Spilman,* Asst. Atty. Gen., for the State.

FURMAN, J. (after stating the facts as above). First. Appellant, who lives in Love county, Okla., which was formerly a part of the Indian Territory, was convicted for having conveyed whisky from one point in said state and county to another point in said state and county. The defense was that the whisky being conveyed was brought by him from Gainesville, Tex., on the railroad train and that it belonged to a club of eight, each of whom contributed a proportionate amount to pay for it, and that appellant was conveying the whisky from the depot to his home for distribution among the owners.

Counsel for appellant rely upon a number of decisions of this court as to the right of a citizen of Oklahoma to purchase intoxicating liquors in another state and ship them as interstate commerce to his home for his own use. All of these decisions were rendered in obedience to the previous decisions of the Supreme Court of the United States to that effect, for this is purely a federal question and one with reference to which we are bound by the acts of Congress and the

decisions of the Supreme Court of the United States. Since the decisions of this court relied upon by counsel for appellant were rendered, the Supreme Court of the United States in the case of *Ex parte Webb,* rendered June 10, 1912, and reported in 225 U. S. 669, 32 Sup. Ct. 769, 56 L. Ed. 1248, has expressly held that the interstate commerce clause in the Constitution of the United States, under which the right of a citizen of Oklahoma to purchase whisky in another state and ship it as interstate commerce to his home or place of business for his own use, was not applicable to the Indian Territory portion of the state of Oklahoma and would not be until the expiration of 21 years from the date of the admission of Oklahoma into the Union. On this question that court said:

"The reservation of the authority of Congress to legislate in the future respecting the Indians residing within the new state is clearly supportable under the federal Constitution, art. 1, sec. 8, which confers upon Congress the power 'to regulate commerce with foreign nations, and among the several states, and with the Indian tribes.' It has been repeatedly held by this court that under this clause traffic or intercourse with an Indian tribe, or with a member of such a tribe is subject to the regulation of Congress, although it be within the limits of a state. *United States v. Holliday,* 3 Wall. 407, 418, 18 L. Ed. 182, 186; *United States v. 43 Gallons of Whisky (United States v. Lariviere)* 93 U. S. 188, 195, 197, 23 L. Ed. 846-848; *Dick v. United States,* 208 U. S. 340, 28 Sup. Ct. 399, 52 L. Ed. 520, and cases cited.

"And it is as clearly consistent with the Constitution to maintain in force an existing act of Congress relating to such traffic and intercourse, so that it shall continue effective within the limits of the new state, as it is to reserve the right to enact new laws in the future upon the same subject-matter.

"We must read the proviso contained in section 1 of the enabling act, and also the declaration in section 21 that 'the laws of the United States not locally inapplicable shall have the same force and effect within the said state as elsewhere within the United States,' in the light of the existing relations, then recently established by treaties and by acts of Congress between the government of the United States and the Five Civ

ized Tribes that occupied the area known as the Indian Territory. Although those tribes had long been treated more liberally than other Indians, they remained none the less wards of the government and in all respects subject to its control. *Cherokee Nation v. Southern Kansas R. Co.*, 135 U. S. 641, 653, 10 Sup. Ct. 965, 34 L. Ed. 295, 301, and cases cited. And after Congress in the year 1893 had inaugurated the policy of terminating their tribal existence and government and allotting their lands in severalty (Acts of March 3, 1893, c. 209, sec. 16, 27 Stat. at L. 645), agreements were negotiated by the Dawes Commission with each of the tribes designated to carry out the objects indicated; and in each of those agreements there was some recognition of the importance of preserving restrictions upon the introduction of intoxicating liquors from without and the traffic in them within the Indian Territory.

"The agreement with the Seminoles was made in 1898 (30 Stat. at L. 567, c. 542), with the Creeks in 1901 and 1902 (31 Stat. at L. 861, c. 676; 32 Stat. at L. 500, c. 1323), with the Choctaws and Chickasaws in 1898 (30 Stat. at L. 507, c. 517) and in 1902 (32 Stat. at L. 641, c. 1362), and with the Cherokees in the latter year (32 Stat. at L. 716, c. 1375.)

"Section 73 of the agreement with the Cherokees (32 Stat. at L. 727, c. 1375) continued in force in that nation the fourteenth section of an act of June 28, 1898, entitled 'An act for the protection of the people of the Indian Territory and for other purposes' (30 Stat. at L. 500, c. 517), which contained a proviso against the sale of liquor in the territory and against the introduction thereof into the territory.

"In the first Choctaw and Chickasaw agreement there was a provision (30 Stat. at L. 509, c. 517) that no law or ordinance should be passed by any town interfering with the enforcement of or conflicting with the laws of the United States in force in said territory, 'and the United States agrees to maintain strict laws in the territory of the Choctaw and Chickasaw tribes against the introduction, sale, barter, or giving away of liquors and intoxicants of any kind or quality.'

"In the Choctaw-Chickasaw Agreement of 1902, sec. 64, which provided for the cession to the United States of lands at the Sulphur Springs, contained a provision (32 Stat. at L. 656, c. 1362) that, 'until otherwise provided by Congress, the laws of the United States relating to the introduction, posses-

sion, sale, and giving away of liquors or intoxicants of any kind within the Indian country or Indian reservations shall be applicable to the lands so ceded, and said lands shall remain within the jurisdiction of the United States court for the southern district of Indian territory.'

"The Seminole agreement likewise provided that 'the United States agrees to maintain strict laws in the Seminole country against the introduction, sale, barter, or giving away of intoxicants of any kind or quality. 30 Stat. at L. 568, c. 542.

"The first Creek agreement provided that 'the United States agrees to maintain strict laws in said nation against the introduction, sale, barter, or giving away of liquors or intoxicants of any kind whatsoever.' Acts of March 1, 1901, c. 676, sec. 43, 31 Stat. at L. 872. And this was not modified by the supplemental agreement. Acts of June 30, 1902, c. 1323, 32 Stat. at L. 500.

"It seems to us that the provisions of the enabling act show that Congress recognized that, because of these agreements or otherwise, the government of the United States was under a duty to the inhabitants of the Indian Territory different from its duty to the inhabitants of the other territory that went to form the new state. We are unable otherwise to explain the insertion in the proposed Constitution of the clause establishing liquor prohibition within the Indian Territory and the exclusion of the other territory from the operation of this clause. This action is indicative of a purpose on the part of Congress to fulfill the spirit as well as the letter of the agreements with the Five Tribes. There were differences in those treaties, so far as the liquor traffic is concerned. But in the enabling act all the tribes were treated alike and in a manner to fulfill the amplest promise given to any tribe, so far—but only so far—as the establishment of general prohibition *within* the new state was concerned.

"But, if the federal law that had prevented the bringing in of intoxicating liquors from without the state was at the same time repealed, the pledges of the government were thereby in a material part broken. For manifestly it would be of comparatively little use to prohibit the manufacture of intoxicating liquors within the territory and their shipment from other parts of the state into the territory, if at the same time all laws

prohibiting the introduction of such liquors from other states into the territory were to be repealed.

"And it is clear that in framing the enabling act Congress was mindful not only of its jurisdiction over commerce with the Indian tribes but was mindful that traffic in liquors between one state and another is subject only to the control of Congress. *Bowman v. Chicago & N. W. R. Co.,* 125 U. S. 465, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700; *Id.,* 1 Interst. Com. R. 823; *Leisy v. Hardin,* 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128; *Id.,* 3 Interst. Com. R. 36; *Lottery Case (Champion v. Ames)* 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492. * * * We are reminded that 'laws which create crime ought to be so explicit that all men subject to their penalties may know what acts it is their duty to avoid' (*United States v. Brewer,* 139 U. S. 278, 288, 11 Sup. Ct. 538, 35 L. Ed. 190, 193), and that ambiguity and uncertainty about the meaning of a criminal statute ought to be resolved by a strict interpretation in favor of the liberty of the citizen.

"But there is no uncertainty or ambiguity about the prohibition of the act of 1895 against carrying intoxicating liquors into the Indian Territory. It is not suggested that there is any express repeal of that prohibition. And we are unable to see that a *pro tanto* repeal by implication leaves anything doubtful or ambiguous in the meaning of that which remains.

"It is not our purpose to qualify the doctrine established by repeated decisions of this court that the admission of a new state into the Union on an equal footing with the original states imports an equality of power over internal affairs. The cases cited by counsel for the petitioner under this head are cases that dealt with matters wholly internal. *United States v. McBratney,* 104 U. S. 621, 26 L. Ed. 869; *Draper v. United States,* 164 U. S. 240, 17 Sup. Ct. 107, 41 L. Ed. 419; *Re Heff,* 197 U. S. 488, 505, 25 Sup. Ct. 506, 49 L. Ed. 848, 855. And see *Ward v. Race Horse,* 163 U. S. 504, 16 Sup. Ct. 1076, 41 L. Ed. 244; *United States v. Celestine,* 215 U. S. 278, 288, 30 Sup. Ct. 93, 54 L. Ed. 195, 199; *United States v. Sutton,* 215 U. S. 291, 294, 30 Sup. Ct. 116, 54 L. Ed. 200, 202; *Hallowell v. United States,* 221 U. S. 317, 323, 31 Sup. Ct. 587, 55 L. Ed. 750, 753; *Dick v. United States,* 208 U. S. 340, 28 Sup. Ct. 399, 52 L. Ed. 520.

"The most recent decision of this court upon the subject of the proper construction of acts of Congress passed for the ad-

mission of new states into the Union is *Coyle v. Smith,* 221 U. S. 559, 31 Sup. Ct. 688, 55 L. Ed. 853, where it was held that the Oklahoma enabling act (34 Stat. at L. c. 3335, p. 267), in providing that the capitol of the state should temporarily be at the city of Guthrie and should not be changed therefrom previous to the year 1913, ceased to be a limitation upon the power of the state after its admission. The court, however, was careful to state (221 U. S. 574 [31 Sup. Ct. 693, 55 L. Ed. 853]) : 'It may well happen that Congress should embrace in an enactment introducing a new state into the Union legislation intended as a regulation of commerce among the states, or. with Indian tribes situated within the limits of such new state, or regulations touching the sole care and disposition of the public lands or reservations therein, which might be upheld as legislation within the sphere of the plain power of Congress. But in every such case such legislation would derive its force not from any agreement or compact with the proposed new state, nor by reason of its acceptance of such enactment as a term of admission, but solely because the power of Congress extended to the subject, and therefore would not operate to restrict the state's legislative power in respect of any matter which was not plainly within the regulating power of Congress.'

"We are here dealing with one of those matters such as are referred to in this citation. The power of Congress to regulate commerce between the states, and with Indian tribes situate within the limits of a state, justifies Congress when creating a new state out of a territory inhabited by Indian tribes, and into which territory the introduction of intoxicating liquors is by existing laws and treaties prohibited, in so legislating as to preserve those laws and treaties in force to the extent of excluding interstate traffic in intoxicating liquors that would be inconsistent with the prohibition. *Dick v. United States,* 208 U. S. 340, 353, 28 Sup. Ct. 399, 52 L. Ed. 520, 525. This being so, and since we find in the Oklahoma enabling act no repeal, express or implied, of the act of 1895 so far as pertains to the carrying of liquor from without the new state into that part of it which was the Indian Territory (saving as to liquor brought in by the state for the use of state agencies established under the provisions of the enabling act), it follows upon the admitted facts that the United States District Court has jurisdiction to punish the petitioner for the offense that he has committed."

On the 26th day of May, 1913, the Supreme Court of the United States, in the case of *United States v. Wright,* 229 U. S. —, 33 Sup. Ct. 630, 57 L. Ed. —, again passed upon this question. Mr. Justice Pitney, delivering the opinion of the court, said:

"The defendant in error was indicted in the United States District Court for the Eastern District of Oklahoma; the charge being that 'on the 19th day of March, in the year 1912, in the county of Muskogee, in the said district, and within the jurisdic·ion of said court, the said county and district then and there being a portion of the Indian country of the United States, (he) did at the time and place aforesaid unlawfully, willfully, knowingly, and feloniously introduce into said Indian country one quart of malt, vinous, spirituous, distilled, ardent, and intoxicating liquor, to wit, whisky, contrary to the form of the statute in such case made and provided,' etc.

"The District Court sustained his demurrer, and the case is brought here under the Criminal Appeals Act.

"The statutes involved are: Section 2139 of the Revised Statutes, as amended by the act of July 23, 1892 (chapter 234, 27 Stat. at L. 260), and by the act of January 30, 1897 (chapter 109, 29 Stat. at L. 506), also section 8 of the act of March 1, 1895 (chapter 145, 28 Stat. at L. 693), and the Oklahoma Enabling Act of June 16, 1906 (chapter 3335, 34 Stat. at L. 267). Extracts from these are set forth in foot-notes to the opinion in *Ex parte Webb,* 225 U. S. 663, 671, 677 [32 Sup. Ct. 769, 56 L. Ed. 1248]. Muskogee county is a part of what was the Indian Territory.

"The District Court in effect construed the indictment as charging, not an interstate transaction, but an introduction of liquor from a point within the state of Oklahoma but outside of what is now Indian country into such Indian country. The decision of this court in the Webb case, which had to do with section 8 of the act of March 1, 1895, and the effect of the Enabling Act upon it, and also the decisions of the Circuit Court of Appeals for the Eighth Circuit in *United States Express Co. v. Friedman,* 191 Fed. 673 [112 C. C. A. 219], and *Mosier v. United States,* 198 Fed. 54 [117 C. C. A. 162], both of which turned upon the effect of the Enabling Act upon the act of January 30, 1897, were reviewed by the District Court, and the conclusion reached, principally because of the line of reasoning

expressed in the opinion in the Webb case, was 'that the provisions of R. S. sec. 2139, as amended by the act of 1892 and the act of 1897, so far as they related, if at all, to the introduction of liquor into the Indian Territory from points outside of that territory but within what is now Oklahoma, must be considered as having been repealed by the Enabling Act.'

"And again: 'This confines offenses of this character, of which the federal court has jurisdiction to those in which the liquor is introduced from a point without the state. It is a violation of the state law, as established by the constitutional provision above referred to, to introduce liquor into what was formerly Indian Territory from some other portion of Oklahoma, but such violation is an offense exclusively within the jurisdiction of the state court. In order to give the federal court jurisdiction, it is necessary that the introduction of the liquor should have been from a point without the state. This is an essential element of the offense, so far as the federal court is concerned, and should therefore be charged in the indictment. It follows that the demurrer must be sustained.'

"The Criminal Appeals Act (Act March 2, 1907, c. 2464, 34 Stat. at L. 1246) provides for a writ of error, to be taken by the United States from the District Court direct to this court, from a decision or judgment sustaining a demurrer to an indictment, 'where such decision or judgment is based upon the invalidity or construction of the statute upon which the indictment is founded.' The present case is clearly within this act, as previously interpreted and applied. *United States v. Sutton,* 215 U. S. 291, 294 [30 Sup. Ct. 116, 54 L. Ed. 200]; *United States* v. *Keitel,* 211 U. S. 370, 385 [29 Sup. Ct. 123, 53 L. Ed. 230]; *United States v. Biggs,* 211 U. S. 507, 518 [29 Sup. Ct. 181, 53 L. Ed. 305]; *United States v. Stevenson,* 215 U. S. 190, 195; *United States v. Miller,* 223 U. S. 599, 602, [32 Sup. Ct. 323, 56 L. Ed. 568]; *United States v. Patten,* 226 U. S. 525, 535 [33 Sup. Ct. 141, 57 L. Ed. —]; *United States v. George,* 228 U. S. 14, 17 [33 Sup. Ct. 412, 57 L. Ed. —]; *United States v. Anderson,* 228 U. S. 52 [33 Sup. Ct. 500, 57 L. Ed. —]; *United States v. Pacific & Arctic Co.,* 228 U. S. 87, 100 [33 Sup. Ct. 443, 57 L. Ed.—].

"Upon the merits, the principal question is whether the acts of 1892 and of 1897 were repealed, as to intrastate transactions, by the effect of the Enabling Act and the admission of the state with the constitutional prohibition of the liquor traffic

that was prescribed by that act. It is not contended that there was any express repeal. The insistence that there was a necessary repeal by implication is supported by arguments that may be outlined as follows: * * *

"Upon the whole, while the matter is not free from difficulty, it seems to us the better argument is against the implied repeal. It follows that the District Court erred in holding the acts in question, viz.; section 2139, Rev. Stat., as amended by the acts of 1892 and 1897, to be no longer in force, and erred in sustaining the demurrer to the indictment. The judgment should be reversed, and the cause remanded for further proceedings in accordance with the views above expressed."

It matters not what the personal opinion of any member of this court may be; this involves a federal question which, under the Constitution of the United States, the Supreme Court of the United States alone has the right to settle. The judges of this court are sworn to support the Constitution of the United States, and, when that court has spoken upon a federal question, this ends the discussion with us, and we are bound to decide in conformity with the opinions so rendered.

In the case of *Titsworth v. State,* 2 Okla. Cr. 268, 101 Pac. 288, this court said:

"If the decisions of the Supreme Court of the United States are wrong, application should and can be made to that court for a reversal of these decisions. It is a waste of time, money, and labor to appeal to this court to set aside anything which that court has decided. The Supreme Court of the United States of necessity must be the final judge of the construction of the United States Constitution. Otherwise we would have a hydra-headed judicial system in which 47 independent appellate courts could construe this instrument as they pleased, which would result, not only in confusion, but in civil war. Each tribunal would be supported by the military force of the government which it represented. This would result in death and destruction to our form of government. Certainly no reasonable person desires this court to adopt a policy which would bring about such serious consequences as this. It would be treason itself. One thing can be depended

upon, and that is that this court will not make any such insane attempt."

We cannot consider the convenience or desires of the people living on the east side of the state. The Legislature itself is powerless to pass any law which would in the least evade the federal decisions on this question. If it is illegal to introduce intoxicating liquors into that portion of the state which formerly comprised Indian Territory, as the Supreme Court of the United States now holds, then the purchase of such liquor is illegal and such liquor could not lawfully be conveyed from one point in that portion of the state to another.

In the case of *Maynes v. State,* 6 Okla. Cr. 487, 119 Pac. 644, this court, speaking through Judge Armstrong, said:

"The law clearly forbids the conveyance from one place to another of intoxicating liquor for any purpose, except such liquor as is purchased at a lawful sale."

Second. But there is another view to take of this question which has already been decided adversely to the contention of counsel for appellant in the case of *Landrum v. State, ante,* 132 Pac. 830, decided at the last term. In that case appellant's defense was that he was the representative of a wholesale liquor house situated in Ft. Worth; that upon application of persons desiring whisky he would write to his house, which, upon receipt of his order, would ship the whisky direct to the persons ordering the same; and that he (appellant) had no interest in the whisky whatever. On this statement of facts this court said:

"The trial court was authorized to find from the agreed statement of facts that this entire transaction was a cunningly devised subterfuge deliberately planned for the purpose of defeating the law. This case is but an illustration of the fact that men who are engaged in the illegal sale of intoxicating liquors in Oklahoma will resort to any expedient or subterfuge for the purpose of carrying on their illegal business. If this judgment is reversed, every liquor house in the United States could establish an agent in every town in Oklahoma to whom persons could apply and get such agent to write let-

ters and sign the name of the purchaser and forward them to his house, which, seeing the letter written in the handwriting of their agent, would take it as an indorsement of the solvency of the purchaser and would, upon receipt of such letter, ship whisky to entire strangers of whom they knew nothing. If this can be done, the prohibitory law of Oklahoma will become the laughing stock of all intelligent persons, and this court would be open to the most severe censure for its misconstruction of the law. It is our duty in good faith to so construe the laws of Oklahoma as to enable them to be enforced with reasonable certainty."

If a person cannot send in orders as the representative of a whisky house and have intoxicating liquors shipped into the state, neither can he, as the representative of others, go out of the state and bring intoxicating liquor into the state and distribute it among those who gave him such orders. If we were going to hold that such conduct was legal, we ought in good faith to place as a syllabus to the opinion, "Bootlegging made safe in Oklahoma." It matters not what the members of this court may think of prohibition, the people of Oklahoma have placed it in the law and it is our duty in good faith to so construe the law that it can be enforced, and this we are going to do, it matters not who may be offended or made to suffer thereby. There is no danger of any man being punished in Oklahoma who obeys the law. The jail is made alone for those who violate the law, and, if a man is sent to jail for violating the law, he has no one except himself to blame.

We fully approve the views expressed by Supreme Court Commissioner Ames in the case of *Blunk v. Waugh,* 32 Okla. 616, 122 Pac. 717, 39 L. R. A. (N. S.) 1093, as follows:

"If plaintiff was the agent of the brewery and was distributing its beer for its benefit, it is manifest that he was furnishing such liquor within the prohibition of the statute. If, on the other hand, the plaintiff received this consignment as the agent of the 105 persons to whom the beer was to be delivered, it is plain that after he received it from the railroad company it had been delivered to the consignee, he be-

ing the consignee, and that his subsequent acts in delivering the 105 casks to the 105 owners was conveying it from one place to another within this state. It is likewise manifest, if the plaintiff was engaged in the business on his own account, that he was merely operating a saloon in this ingenious manner, and that therefore he was either selling or giving away, or otherwise furnishing, the beer. It is manifest, therefore, that the business of the plaintiff is in violation of the laws of this state. * * *

"The argument is made by the plaintiff, however, that if these 105 casks of beer might have been shipped in 105 separate express packages, and have been delivered by the express company to the 105 consignees, there is nothing illegal in the business which he is transacting. This argument, however, overlooks the fundamental and substantial difference between the plaintiff and the express company. The express company is a common carrier pure and simple and can be compelled to accept for transportation and delivery any legitimate article of commerce, and its entire service, rendered in connection with a shipment of intoxicating liquors, is in the actual transportation and delivery thereof. For us to believe this of the plaintiff requires an amount of credulity which we do not possess. The plaintiff is engaged in the business of receiving large consignments of intoxicating liquor by interstate carrier and distributing them to a large number of small consumers in Oklahoma City. He is either the *bona fide* consignee of these large shipments or he is not. If he is the *bona fide* consignee, it is plain that the shipment is terminated when received by the plaintiff, and certainly his disposition of it thereafter cannot possibly be protected as a part of interstate commerce. To do so would in substance reinstate the original package law, which Congress has expressly legislated against. If the plaintiff is not the *bona fide* consignee, then his business involves a violation of the sections in the Penal Laws of 1909, which we have quoted. It therefore seems to us a demonstrable fact that the business of the plaintiff is not and cannot be protected by the Constitution and laws of the United States; and this conclusion is reached without considering several other aspects of the plaintiff's business which seem to conflict with those sections of the Penal Laws."

We find that the facts and law of this case are against

appellant. The judgment of the lower court is therefore in all things affirmed.

ARMSTRONG, P. J., and DOYLE, J., concur.